## Case No. 8,201.

### LEE v. ROGERS et al.

[2 Sawy. 549; [1] 1 Am. Law T. Rep. (N. S.) 218.]

Circuit Court, D. California. Feb. 24, 1874.

PAID JUDGMENT—SALE—ASSIGNEE OF PAID JUDGMENT—POWER OF ATTORNEY—INCIDENTAL POWERS—ACTIONS AGAINST BELLIGERENTS.

1. A sale of lands under an execution issued upon a judgment which had been fully paid, is void.

2. W. had a judgment against C., which was the first lien on his property. T. also had a judgment, which was the second lien on the property. C. paid W.'s judgment in full, but took an assignment of it in the name of his hired man, who paid nothing for it. Afterward, to avoid an attachment, C. confessed a judgment in favor of L., for a debt previously due him, which became a lien upon the property, and, in order to give L. a preference over T., C. procured an assignment to him of W.'s judgment, for which no additional consideration was paid; but L. was not aware that it had been paid. C. afterward confessed a judgment in favor of F., which also became a lien on the property. L. afterward sold the lands on W.'s judgment, and became the purchaser. Afterward F. became purchaser of the same lands under his own judgment. *Held*, that as to F., L. was not a bona fide assignee of W.'s judgment for a valuable consideration; and that his sale was void.

3. By his purchase F. acquired the title to the land.

4. L. executed a power of attorney to H., authorizing him to collect his said judgments against C., by sales under execution, etc., to receive the money thereon, "arbitrate or compound" the same, and for that purpose to employ counsel. After the aforesaid sales, F. brought an action against L., to annul the said sales and conveyances to L., as clouds on his (F.'s) title. H. consulted counsel, who advised him that the said sales under W.'s judgment, after payment, were void, and L.'s title invalid. *Held*, that as incident to the powers expressly given to collect said judgment, arbitrate and compound the same in connection with subse-

1 [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

15FED.CAS.—15

quent instructions from L., by letter, H. had power to authorize counsel to appear in said action, and consent to a judgment annulling said sales upon terms that enabled him to realize the amount due to L. on his judgment.

[Cited in Starr v. Stark, Case No. 13,317.]

5. The existence of war does not prevent the citizens of one belligerent power from taking proceedings for the protection of their own property in their own courts, against the citizens of the other, whenever the latter can be reached by process.

Bill in equity, wherein complainant [Richard B. Lee] seeks to establish a trust in his favor as to certain lands situate in the city of Oakland, held and claimed by the defendants [Daniel Rogers, administrator, and others]. The pleadings and evidence establish the following facts: In the years 1858 and 1859, Andrew J. Coffee was the owner of the lands in question. He had become embarrassed. Sometime in 1856 the agent of the complainant loaned the sum of six thousand dollars of the latter's money on a note signed by one Green, indorsed by said Coffee. It is not clear and not material whether this money was borrowed for the benefit of Coffee, or of Green, or their joint benefit. On September 23, 1858, Joanna Wheelock obtained a judgment in the twelfth judicial district, against A. P. Green, L. Ransom and said Coffee, for $3519.92 and costs, which became a lien upon the property in question. Messrs. Haggin and Tevis obtained a judgment against Coffee and Green for some $12000, which also became a subsequent lien upon the property.

The Haggin and Tevis judgment at the time stood in such position that Coffee claimed that he was discharged, and he had an action pending to procure his own exoneration. In October, 1858, said Coffee borrowed of J. A. Freanor something over $2000, for the purpose of paying, in part, the said Wheelock judgment; and with the money so borrowed, and other money obtained from other sources, he paid the Wheelock judgment in full; but instead of having the judgment satisfied of record, said Coffee procured an assignment of said judgment to be made to one Lester, a hired man of said Coffee. Said Lester paid nothing for said assignment. On January 1, 1859, Coffee executed to Freanor a promissory note for $700, being the balance then due him on said sum borrowed as aforesaid, all said sum except said balance having been paid before that date.

In May, 1859, the complainant, becoming uneasy about his money, determined to secure it, and for that purpose directed his attorney, Col. Crockett, to commence suit by attachment; and the papers for an attachment were accordingly prepared. Before commencing the suit complainant notified said Coffee of his purpose, and thereupon Coffee requested him not to attach. Coffee told complainant that he controlled the Wheelock judgment; that it was the first

lien on his property, being prior to the Haggin and Tevis judgment, which was at that time the only other lien; that he would procure the Wheelock judgment to be assigned to complainant; and would, also, confess a judgment in complainant's favor for the amount due him. Upon consultation with his counsel, this proposition was accepted by complainant. On the next day, May 19th, 1859, Coffee brought him an assignment of the Wheelock judgment in due form. Col. Crockett drew up the papers for a confession of judgment, which were signed and delivered, and complainant went to the clerk's office in Alameda county and had his judgment duly entered.

Complainant paid no further consideration for the assignment of the Wheelock judgment. It was taken only as an additional security for the pre-existing indebtedness; and probably, with the design that it should take precedence over the Haggin and Tevis judgment, in case Coffee should not get rid of it in the suit pending for that purpose. Upon thus securing complainant, Coffee understood that he was to have further indulgence. Immediately after these transactions, on May 21st, 1859, Coffee confessed a judgment to Freanor for the amount of said $700 note, interest and costs, which also became a lien on said property.

Soon afterward Coffee went to the Eastern states, and was absent till some time in the fall. Soon after Coffee's departure, on June 9, 1859, said complainant caused an execution to be issued on the said Wheelock judgment, and, upon said execution, had a large portion of the lands in controversy sold on July 1, 1859, himself becoming the purchaser at the sum of $2950. On or about July 5, 1869, the complainant left for the Eastern states, leaving instructions with his attorney in fact, Jno. W. Haynes, to make further sales. In pursuance of said instructions, another execution was issued on said Wheelock judgment, on July 13, 1859, under which the remaining lands in controversy were sold on August 1, 1859, and bid off by said Haynes, in the name and for the benefit of the complainant, for the sum of $1585, which two sales satisfied the Wheelock judgment. No redemption having been made, the sheriff executed deeds of conveyance in due form in pursuance of said sales, April 16, 1860. Subsequently, other property was sold upon complainant's own judgment, from which some $4000 were realized and applied on the judgment. Complainant went to Washington, where he remained till the war of Rebellion broke out, when he resigned his commission in the United States army, went to the states in rebellion, accepted a commission in the rebel army, and continued in the service within the rebel lines till the close of the war.

Said Freanor being aware that the Wheelock judgment had been satisfied before its assignment to complainant in part with money borrowed from him for that purpose, and for a part of which his judgment had been obtained, had an execution issued on his own said judgment, April 25, 1861, and the same property purchased under the Wheelock judgment, sold thereunder on May 20, 1861, before the expiration of his lien, himself becoming the purchaser. No redemption having been made, the sheriff executed a deed in due form, in pursuance of said sale, December 28, 1861.

Afterward, on May 13, 1862, said Freanor filed his bill of complaint in the district court of the Third judicial district, against said Lee, complainant in this action, in which he set out substantially the facts herein stated, claimed a valid title to said lands in controversy, under his judgment and sale; alleged that complainant's deeds, although void, were regular on their face and constituted a cloud on his title; and prayed a decree that the said Wheelock judgment had been satisfied before said transfer and sales thereunder, and that said sales and deeds, given in pursuance thereof, be annulled and adjudged to be void.

At the date of the filing of said bill of complaint of Freanor, defendant, J. W. Haynes was the attorney in fact of the complainant, having charge of complainant's business in California. Said complainant, at the time, was within the rebel lines, and, for that reason, no communication could be had between him and his attorney, and none was had for a long time afterward. Mr. Haynes was, therefore, compelled to act upon his own judgment respecting the action. Under the statutes of California, service could be obtained upon absent defendants by publication of summons. When the filing of this bill of complaint came to the knowledge of Haynes, he consulted with his own attorney, Mr. Rogers, and the former attorney and personal friend of complainant, Col. Crockett, and both advised him that if the facts alleged could be established, the sales on the Wheelock judgment, and the deeds thereunder, would be set aside as void. Upon an investigation of the facts, both Mr. Haynes and his counsel became satisfied that the Wheelock judgment had been fully paid before its assignment to complainant, and that the sales thereunder were void. Col. Coffee now entered upon negotiations between Freanor and Haynes, which resulted in an arrangement between the parties, by which it was agreed that Col. Crockett, upon special authority from Haynes, as the attorney in fact of the complainant, should enter the latter's appearance in Freanor's action, and consent to a decree in pursuance of the prayer of the bill of complaint annulling the sales and deeds under the Wheelock judgment; that Thomas J. Haynes should pay the principal, interest, cost and attorney's fees on Freanor's judgment against Coffee; that Freanor should convey the lands in controversy to said Thomas

J. Haynes, and that said Thomas J. Haynes should sell the lands, and out of the proceeds repay, firstly, the said sum paid to Freanor; secondly, the amount, principal and interest due from said Coffee to complainant on the judgment confessed to him; and, after paying these demands, any surplus should go to Coffee's other creditors. This appears to be the arrangement entered into between Freanor, Coffee and Haynes. Freanor's object after securing his own demand was to favor Coffee, and he would enter into no arrangement that did not give to Coffee the benefit of any surplus. Col. Crockett, however, who was consulted upon the law points, does not appear to have understood that the residue was to go to Coffee, but that the land was to be held for the benefit of complainant. But the others who made the agreement agreed as stated. With the exception of this part of the arrangement, which Col. Crockett does not appear to have understood, or if understood, had been forgotten during the many years which had elapsed, the settlement had his approbation, as being the best thing that could be done under the circumstances; as it secured to complainant the whole amount due him, whereas, if Freanor should succeed in his suit, complainant was liable to lose all. In pursuance of the said arrangement between Coffee, Freanor and Haynes, J. W. Haynes executed an instrument authorizing Col. Crockett to appear, in the words following: "In the district court of the Third judicial district, in and for the county of Alameda. Freanor v. Lee. I do hereby authorize J. B. Crockett, as my attorney, to appear on my behalf to the above entitled action, and to file an answer therein, consenting that a decree be rendered in said cause, in accordance with the prayer of the complaint. San Francisco, 30 July, 1862. R. B. Lee, by Jno. W. Haynes, his attorney in fact." Col. Crockett, in pursuance of said authority, filed the following answer, viz.: "In the district court of the Third judicial district, in and for the county of Alameda. Freanor v. Lee. The defendant, Richard B. Lee, by his attorney, comes, and for answer to the complaint, says he denies all imputations of fraud or fraudulent conduct contained therein, but admits the other allegations in said complaint contained, and does not deny the plaintiff's right to the relief demanded, and consents that a decree be entered in accordance with the prayer of the complaint, and that said decree be entered at the present term of the court. J. B. Crockett, attorney for defendant." And thereupon a decree was entered adjudging said sales and deeds under the Wheelock judgment void. In further pursuance of said agreement, Thomas J. Haynes paid to Freanor some $1472, the amount due him, and Freanor conveyed the lands to said Haynes. Soon after said conveyance, Coffee, as broker for Haynes, commenced negotiating sales, and through him

the said lands were, from time to time, all sold in various parcels, and to various purchasers, and out of the proceeds, the said sum advanced by Haynes to Freanor was first paid; then the amount due from Coffee to complainant, after which the balance went to Coffee's other creditors. At the time of said agreement between Coffee, Freanor and Haynes, there were funds of complainant under the control of Haynes to an amount greater than the sum paid to Freanor, but they were at the time otherwise invested, and were not then available for that purpose, and Haynes advanced the same out of his own funds.

Thomas J. Haynes was really expected by the complainant to act as his attorney in fact. He had before been in complainant's employ, and for a long time previous to this transaction, his confidential friend as well as agent. But Thomas J. Haynes went East at the same time with complainant, and, for this reason, the power of attorney was given to his brother, John W. Haynes, although it was understood and intended that he should act under the supervision and advice of Thomas J. Haynes, when the latter should return; or, rather, that Thomas J. Haynes should, in fact, be the active agent. The power of attorney under which John W. Haynes acted was executed by complainant on the day he left, July 5, 1859. It contained no express power to sell land, or otherwise dispose of it, except to lease, but it authorized him to demand and receive all moneys, goods, wares and merchandise, debts, choses in action, etc., and to sue therefor, and to employ counsel to represent him in court "for that purpose;" "to submit to arbitration or compound the same," and "to prosecute through final process any and all judgments to me belonging, and, at the sales under execution issued thereon, to become a purchaser in my name of any lands," etc., receive the money thereon, and any redemption money, etc. This is the only formal technical power of attorney held by Haynes. But, before the war broke out, and while complainant was still in Washington, creditors of Coffee in California had expressed the opinion that the said sales were void, and a design to attack them.

These facts coming to the knowledge of Thomas J. Haynes, on February 20, 1861, he informed complainant by letter of the threats made, and the grounds upon which the sales were claimed to be void. And he particularly refers to Freanor by name as one creditor who claimed the Wheelock judgment to have been satisfied with the money loaned by himself. Also, in a letter dated March 10, 1861, he informs complainant that he has submitted the case to his counsel, Mr. Rogers, who advised him that, "in his opinion, if the creditors assailing those titles can satisfactorily prove the fact of the judgment having once before been paid, then the sheriff's sale would be set aside by the court," and, he adds among

other things, "I am satisfied that an attempt will be made as stated in my letter of 20th ult." In answer to Haynes' said letter of February 20, the complainant writes from Washington to Thomas J. Haynes a letter, under date of March 20, 1861, in which he animadverts upon the charges of fraud, etc., made by Coffee's creditors in relation to the Wheelock judgment, and, among other things, says: "As to my Oakland property, you must be governed by your own judgment as to its management, and should it be necessary to go to law, employ whom you think best." Under date of April 6, 1861, complainant again writes in answer to Haynes' letter of March 10, wherein he refers to it as "enclosing the opinion of Mr. Rogers," and after sundry suggestions about the Wheelock judgment, he says: "As to the clause in my letter of August 22, 1860, you must, as in all cases connected with my Oakland property, be governed by your own judgment, and such legal advice as you may deem expedient." The complainant himself testifies that Thomas J. Haynes, while East, was a guest at complainant's house in Washington; that a short time before Haynes' return to California, complainant had been informed that Col. Coffee had said his title under the Wheelock judgment might be assailed; that the matter was fully discussed between him and Haynes, and that "I (complainant) charged Thomas J. Haynes, upon his return to California, if any such attempt was made to call upon and advise with Col. Crockett as to the necessary steps in the defense of my title."

Complainant further testifies on the subject of the authority of the Haynes brothers to employ counsel on his behalf. "I mean to say, I did not specifically authorize an appearance in that particular action, not knowing of the existence of any such action." But he says: "He (John W. Haynes) was authorized to the extent given in my power of attorney to him, and both himself and his brother, Thomas J. Haynes, were enjoined verbally, and probably subsequently in writing—of which I have no recollection—to employ Col. Crockett as my lawyer in all cases touching my interest if his services could be rendered available; if not, then to employ other counsel;" and this is substantially repeated several times. During the war there was no communication between complainant and his agents here, the Haynes brothers, and he was not advised of the transactions relating to the property in question, which occurred subsequently to the breaking out of the war, until some time after its termination. After the war closed Haynes remitted to him the balance of Coffee's indebtedness, which was received by complainant before he was informed of the said transactions. According to Coffee's testimony, which is not contradicted, there was paid to complainant and his agents for him by Coffee, and out of his property on said $6000 loan, in all, the sum of seventeen thousand three hundred and fifty dollars. There are about one hundred defendants in this action who are purchasers for a valuable consideration of various parcels of the land in controversy from Haynes and his grantees, deriving title through said conveyance from Freanor to Thomas J. Haynes. Many, if not all of them, have put extensive and valuable improvements on the lands thus purchased. The complainant seeks to have the judgment in the case of Freanor adjudged void, on the ground of fraud; and, also, on the grounds of want of power in Haynes to authorize an appearance, or of Col. Crockett to appear and consent to the said judgment; and that the several defendants holding under the conveyance from Freanor be adjudged to hold their title in trust for complainant, and that they be decreed to convey to him, also, prayer for an account as against Haynes and Coffee, etc.

The complainant claims: (1) That by his sales and conveyances under the Wheelock judgment he took a valid title to the lands. (2) That Haynes had no power, as his attorney, in fact, to authorize Col. Crockett to appear; and that Col. Crockett had no authority to appear in Freanor's suit and consent to the decree entered therein, annulling said sales and conveyances under the Wheelock judgment, and that said proceedings are void. (3) That said arrangement between Freanor, Haynes and Coffee, by which said sales and conveyances were annulled, and said lands conveyed by Freanor to Thomas J. Haynes, and afterward sold, and the proceeds appropriated as hereinbefore stated, was made with the intent to defraud complainant, and, consequently, void. (4) That Col. Crockett's appearance in the action of Freanor v. Lee, having referred to the written authority given by Haynes as his attorney in fact for complainant, which written authority was also made a part of the record, purchasers had record notice as to the same, and were bound to ascertain the powers of Haynes; that they are chargeable through the record with notice of the defect in their title, and stand in no better position than Thomas J. Haynes, from whom they derive title. (5) That Haynes, having obtained the apparent title through a fraudulent arrangement with Freanor and Coffee, his vendees, even though bona fide purchasers, could obtain no better title than he himself had. (6) That the said arrangement for vacating the said sales under the Wheelock judgment being with an alien enemy, and, as is charged by the complainant for the purpose of avoiding confiscation of his property, are void. (7) That no action could be legally prosecuted in the courts of the state against an alien enemy while actually absent within the enemy's lines engaged in the war.

B. S. Brooks, for complainants.

Mr. Rogers, Mr. Williams, Mr. Irving, Mr. Crane, Mr. Barstow, and others, for defendants.

SAWYER, Circuit Judge, (after stating the facts.) It is settled without any authority.

so far as I am aware, to the contrary, that a sale under a judgment after its full payment is absolutely void. And a number of the authorities go so far as to say that such a sale is void under all circumstances, and as to all persons, even though purchasers in good faith for a valuable consideration, and without notice. The principle stated in the authorities is, that the judgment is the sole foundation of the sheriff's power to sell and convey; that, if the judgment has been paid at the time of the sale, the sheriff's power is at an end, and he acts without authority; and that the purchaser under a power is chargeable with notice if the power does not exist, and purchases at his peril. The following are the principal authorities upon the point: Hammatt v. Wyman, 9 Mass. 138; King v. Goodwin, 16 Mass. 63; Wood v. Colvin, 2 Hill, 568; Carpenter v. Stilwell, 11 N. Y. 69, 70, 76; Swan v. Saddlemire, 8 Wend. 681; Lewis v. Palmer, 6 Wend. 368; Craft v. Merrill, 14 N. Y. 461; Neilson v. Neilson, 5 Barb. 565–569; Cameron v. Irwin, 5 Hill, 275; Delaplaine v. Hitchcock, 6 Hill, 17; Deyo v. Van Valkenburgh, 5 Hill, 246; Sherman v. Boyce, 15 Johns. 443; Jackson v. Anderson, 4 Wend. 480; Mouchat v. Brown, 3 Rich. Law, 117; Hunter v. Stevenson, 1 Hill (S. C.) 415; State v. Salyers, 19 Ind. 432; Skinner v. Lehman, 6 Ohio, 430. Tax sales after payment of the taxes have often been held to be void, even as to innocent purchasers, upon the same principles. Jackson v. Morse, 18 Johns. 441; Curry v. Hinman, 11 Ill. 420; Hunter v. Cochran, 3 Barr [3 Pa. St.] 105; Dougherty v. Dickey, 4 Watts & S. 146; Blight v. Banks, 6 T. B. Mon. 206.

The Wheelock judgment having been fully paid before its assignment to complainant, and before any sale under it, there can be no doubt that the sale was void. There was no vitality in the execution issued by complainant's direction, and there was no power in the sheriff to sell. This is the legal aspect of the case. But complainant's counsel insists that, at the time of the assignment of the judgment, Coffee led complainant to believe that the judgment was still unsatisfied, and that, conceding the sales to be void at law, he, and those claiming under him, are in equity estopped from alleging the prior payment of the judgment, and the invalidity of the sales under it. Whatever the equitable rights of the parties might be, if the question had arisen between complainant and Coffee alone, I am unable to take that view of the case as it is now presented. Immediately after the assignment of the Wheelock judgment, and the confession of judgment in favor of complainant, Coffee confessed another judgment in favor of Freanor, which at once became a lien upon the land, subject only to the rights of complainant then vested—the prior lien of complainant's own judgment. This was before any steps had been taken by complainant to enforce the satisfied Wheelock judgment. Complainant had paid noth-

ing whatever for the Wheelock judgment. He had at that time parted with nothing. He had in no particular placed himself in a worse position than he was in before in consequence of the assignment. At the time he took the assignment, he also took a confession of judgment for the entire amount of his debt, which became a lien on Coffee's lands, and of itself without reference to the assignment, gave him all the advantage he could by any possibility have obtained by the attachment proceedings, which he forbore, and put him even in a better position than the attachment would have done. The only possible object to be obtained by the assignment of the Wheelock judgment was to get ahead of the Haggin and Tevis judgment, the lien of which had already attached; and even for this purpose no consideration was paid or given.

Besides, the assignment of the Wheelock judgment was taken under very suspicious circumstances, to say the least. Complainant dealt, not with the judgment creditor, but the judgment debtor. The judgment debtor professed to control the judgment against himself. The judgment debtor, not the judgment creditor, procured, brought to him and delivered the assignment, and without any new consideration. This is a circumstance that ought of itself to have excited the suspicion of a prudent man, and put him upon inquiry, as to how it happened that the debtor controlled the debt apparently due from himself to another. It doubtless would have excited inquiry, had the complainant intended to pay any consideration for the judgment, or had he been actuated by any other motive than a desire to get into a better position that he could occupy by any act of his own by obtaining a preference over a vested lien already attached in favor of Haggin and Tevis. For this purpose it was evidently not desirable to scrutinize the claim assigned to him too closely, as his knowledge would only make him particeps criminis in the wrongful act. For any other purpose the assignment was useless, as his own confessed judgment took precedence over all others, and afforded him all the security and all the advantages that the Wheelock judgment could give. The Wheelock judgment had cost complainant no new consideration—he had parted with nothing—at the time when Freanor's lien attached; and with reference to him he was not, under the circumstances at that time, a bona fide purchaser of the judgment for a valuable consideration.

Freanor's right vested at the time his lien attached, and at that time the Wheelock judgment had been fully paid; and, as to him, there was then no matter of estoppel in favor of complainant. Subsequent to that time, no act of either Coffee or the complainant, or both combined, could affect the rights of Freanor.

The subsequent issue of execution upon the Wheelock judgment, the sale thereunder, and the allowing of complainant's lien under his

own judgment, so far as not satisfied by other sales to lapse, in no way affected the rights of Freanor already vested. In my judgment, the sale and conveyance to Freanor under his judgment vested in him the legal title to the land. Freanor's title was from that time perfect, and in no respect dependent upon the proceedings to annul the sales under the Wheelock judgment, subsequently taken. The only effect of the decree in the case of Freanor v. Lee was, to remove a cloud from his title previously acquired. I see no sound reason why, upon the receipt of the sheriff's deed, he could not at once have maintained an action at law upon his title to recover the land against the complainant, or any other party who might have been in possession. See the authorities before cited.

If I am right in this view, then Freanor's deed to Thomas J. Haynes conveyed a complete title, irrespective of the proceedings in equity, in which the sales and conveyances to complainant under the Wheelock judgment were declared void. But, if wrong in this, the view I take upon the other points would lead to the same result. I am by no means clear that the power of attorney to J. W. Haynes is not of itself ample to empower him to authorize Col. Crockett to appear in the case of Freanor v. Lee, and consent to the decree entered. It is true that there is no express power to convey land, or authority in so many words to abrogate titles to land. But is not the power assumed by Haynes, under the circumstances of this case, incidental to other powers granted? It does authorize Haynes to collect, demand and receive all money due complainant, to sue therefor, and employ counsel to appear for him as he may deem expedient for the recovery of the same, and for that purpose "to submit to arbitration, and compound the same," and "particularly to prosecute through final process any and all judgments to me belonging, and at the sale under the execution issued thereon to become the purchaser in my name of any lands," etc.

This power of attorney was executed on July 5th, 1859—the day on which complainant left California, and four days after the first sale on the Wheelock judgment. The subsequent sale on the second execution issued on that judgment was made by Haynes himself, August 1, in pursuance of this power of attorney and instructions from complainant. The power of attorney then was made in part with special reference to collecting the money from Coffee on these judgments, the object at the time being to obtain money, not land. The title even on the first sale had not yet vested in complainant. He had only got an inchoate, contingent interest, which might be defeated on paying the money and redeeming within the time appointed by law. The subject matter, then, upon which this power of attorney was intended to operate was in part these judgments, and executions, and with a view to se-

curing the money due thereon, and to that end the attorney was authorized to act as to him it should seem best for the interest of his principal; to employ counsel in relation thereto, and "to arbitrate or compound the same." The end to be accomplished was to obtain a real substantial satisfaction of these judgments by collecting the money, and the attorney was authorized to bid in the property, in case it should be deemed necessary or advisable, at the contemplated sale; and to receive the redemption money in case it should be paid on the sale already made, and other sales to be made. Haynes proceeded to sell, and there being no other satisfactory bidders he purchased for complainant, the amount being credited on the judgment. It turned out that he got no money, and in the opinion of his counsel no land, and consequently no real, although an apparent, satisfaction of the judgment. He had, as he had good reason to suppose, utterly failed to accomplish his trust—had failed to collect the money or obtain an equivalent, the title having failed through an incurable vice in the judgment through which he sought to make the money. An opportunity occurred, however, by which, through a compromise or compounding of the matter, he could effect the object of the power and still secure payment. Even if he erred as to complainant's real legal rights, there was the strongest reason to fear the loss of the property. It is difficult to see wherein this fails to come within the purview of the power. The contest is not yet ended. The fruits of his efforts are about to slip from his grasp, unless he proceeds further, and he does proceed, and through a compromise secures the full amount due his principal. It appears to me that this power to enter into the arrangement by which he ultimately secured complainant's debt, is incident to the main power conferred to collect these judgments. But however this may be, this power of attorney was not the only authority Haynes had. It is not necessary that authority should be conferred by a formal technical power of attorney. After these sales had taken place, and after the execution of the sheriff's deeds, Haynes had informed complainant by at least two letters received by him at Washington, before the war broke out, that his title was likely to be contested by Coffee's creditors, on the grounds already discussed; and in one of these letters Freanor was particularly referred to as one who claimed the title under the Wheelock judgment to be void. In answer to these letters, and in reference to the threatened contest mentioned therein, he writes to Haynes, and in a letter bearing date April 6, 1861, among other things, says: "As to the Oakland property, you must be governed by your own judgment as to its management, and, should it be necessary to go to law, employ whom you think best." In a letter dated April 6, 1861, in answering the letter referring to

Freanor, and acknowledging the receipt of Rogers' opinions that complainant's title is invalid, he says, among other things: "As to the clause in my letter of August 22, '60, you must as in all cases connected with my Oakland property be governed by your own judgment, and such legal advice as you may deem expedient." Thus, in addition to the fact that the collection of the demand against Coffee, and the completion of the enforcement of the Wheelock judgment had been committed to Haynes by his formal power of attorney, dated July 5, 1859, the complainant, after being informed that the title acquired was likely to be attacked by creditors of Coffee, and Freanor especially; and of the opinion of counsel that his title was invalid, further by letter commits the matter to Haynes' discretion, with directions to employ such counsel as he should deem prudent. In one of these and in other letters he directs him to employ Col. Crockett in all matters relating to his interests where his services could be had.

In my judgment, under this power of attorney, and these subsequent instructions taken together, Mr. Haynes was fully empowered to employ counsel in the case of Freanor v. Lee, subsequently commenced; and that both they and the counsel employed were authorized to pursue the course they did, if in their judgment that course was most conducive to the interests of complainant. That they acted in good faith, I see no good reason to doubt. Soon after the last letter from complainant referred to was written, the war of Rebellion broke out, and complainant resigned his commission in the United States army, and withdrew himself within the rebel lines, where he continued in the rebel service during the war, and there was no further opportunity to communicate with him in relation to the matter. Freanor filed his bill against complainant to remove the cloud from his title.   Mr. Haynes consulted Col. Crockett, who had been complainant's attorney, and whom complainant had directed him to consult in all matters pertaining to his interest. The facts of the case having been fully investigated, both Col. Crockett and Mr. Rogers, Haynes' own attorney, were of opinion that complainant had no title. Upon this hypothesis, the action was in no sense necessary to give Freanor a title, for that he already had. A decree would only serve to remove a cloud upon a title already perfect at law. Complainant was without title, and without the means, so far as anything to the contrary appears, to satisfy his own judgment from any other source. Upon negotiations between Freanor and Haynes, brought about through Coffee, it was ascertained that by an appearance in Freanor's suit on behalf of complainant, and consenting to a decree removing the cloud, Freanor would consent to a sale of the land, and the payment of the proceeds, first, on his own demand against Coffee;

secondly, the demand of complainant; and, lastly, that the balance should go to Coffee's other creditors. By this means the complainant would get all the money due him, thereby accomplishing the original object of his judgment, while on the other hand he was likely to lose all. Upon the hypothesis assumed, Freanor was in a position to hold the land himself. Nothing could be done without his assent, and he was not willing to surrender his rights for the benefit of complainant, although he would do it for Coffee's benefit. It was, therefore, in the minds of complainant's agents, and their counsel, only a question whether it was for complainant's interest to permit the cloud to be removed in consideration of getting the moneys due him, or by refusing to enter into the arrangement, risk losing all. The former course was pursued, and I think wisely. It was such a course as any prudent counsel would be likely to advise, and any prudent business man to adopt, if present and acting for himself. I see no good ground for supposing that there was any fraud perpetrated by any of the parties engaged in this compromise. It matters not whether Freanor in surrendering his right was actuated by motives of friendship for Coffee, or by a due regard for the intrinsic justice of the case. He was in a condition to prescribe terms, and it cannot be denied that he acted with liberality, and a due regard to the just claims of all. The arrangement agreed upon was subsequently carried out, and the result was that Freanor obtained his money; complainant his; Coffee's other creditors theirs; and Coffee was partially, if not wholly, relieved from the inconvenience of insolvency. By the conditions of the arrangement under which Freanor conveyed to Thomas J. Haynes, complainant was only entitled to receive the amount due him. That he received, and after receiving his money, he had no further interest in the property; and it was no concern of his what became of it or its proceeds.

I do not think that either Haynes or Crockett, under the circumstances, either exceeded his powers, or improvidently or unwisely exercised them.   But if I am mistaken as to the powers of Haynes and Crockett, I think still that the judgment entered upon the appearance and consent of Col. Crockett in Freanor v. Haynes, is valid as to the vendees of Haynes without actual notice for a valuable consideration.   The judgment is in all respects regular on its face.   Col. Crockett was an attorney of the court.   He appeared as such in the case.   It is true, his appearance refers to his authority as derived through Haynes as attorney in fact of complainant, and the written authority to appear is filed and made a part of the judgment roll or record.   But the power of attorney to Haynes is not in the record.   The record stops with the authority given to Crockett by Haynes.   Whether Haynes was

duly authorized or not was a question to be determined by the court, in ascertaining whether jurisdiction of the person had been acquired; and it must be conclusively presumed that the court determined the question of Haynes' authority correctly, and upon sufficient evidence. Purchasers were not bound to look beyond the record to see whether the judge committed any error or not. They were entitled to rely on the judgment as they found it. The judgment is regular on its face. It does not of itself affirmatively show any want of authority in Haynes. The judgment is conclusive and cannot be collaterally questioned. Hahn v. Kelly, 34 Cal. 391; Sharp v. Lumley, 34 Cal. 615, 616; Ryder v. Cohn, 37 Cal. 89; Quivey v. Porter, 37 Cal. 462; Eitel v. Foote, 39 Cal. 440; Mahony v. Middleton, 41 Cal. 44; Blasdel v. Kean, 8 Nev. 308; Galpin v. Page [Case No. 5,205].

A point is made, and pressed with some earnestness, that if the object of the transaction by which the decree in Freanor v. Lee was permitted to be taken, and the property conveyed by Freanor to Haynes was to get the title out of complainant in order to protect it from confiscation, the proceedings were all void, because complainant was at the time an alien enemy, and the act, on that ground, unlawful.

This may have been an additional motive in the mind of the counsel of complainant to assent to the arrangement contemplated. But if so it was merely incidental to the main object, which undoubtedly was to secure the money due to complainant, which was in imminent danger of being lost otherwise than by confiscation. Besides, there is nothing to show that Freanor was in any way influenced by such considerations. The title conveyed and the trusts imposed by him, at least as to parties other than complainant, cannot be affected by the secret motives which actuated the representatives of the latter in consenting to the decree.

It is further claimed that a valid judgment could not be obtained removing the cloud upon Freanor's title, even if the court could get a service of process in any mode recognized by law, or acquire jurisdiction by means of an appearance made by an attorney duly authorized. The decisions of the supreme court settle that question. In U. S. v. Grossmayer, 9 Wall. [76 U. S.] 75, it seems to be conceded that "a resident in the territory of one of the belligerents may have in time of war an agent residing in the territory of the other, to whom his debtor could pay his debt in money, or deliver to him property in discharge of it, but in such case the agency must have been created before the war began." Now that is the case in hand. Coffee was the judgment debtor of complainant, whose power of attorney to Haynes, and all whose subsequent instructions, verbal and by letter, relating to this business, were given before the war broke

out. If Haynes had power to receive the debt or property in discharge of the debt, he must have had power, notwithstanding the war, to enter into these arrangements by means of which the money or property could be received. Besides, at the present term, the supreme court of the United States has held in University of Missouri v. Finch, 18 Wall. [85 U. S.] 106, that a sale of real estate under a power contained in a trust deed given to secure a debt executed before the late Civil War is valid, notwithstanding the fact that the grantors in the trust deed were citizens and residents of the state in insurrection at the time of the sale made while the war was flagrant; and the court say: "But this court has never decided, nor intentionally given expression to the idea that the property of citizens of the rebel states located in the loyal states was, by the mere existence of the war, exempted from judicial process for debts due to citizens of the loyal states contracted before the war. A proposition like this, which gives an immunity to rebels against the government not accorded to the soldier who is fighting for that government in the very locality where the other resides, must receive the gravest consideration, and be supported by unquestioned weight of authority before it receives our assent. Its tendency is to make the very debts which the citizens of one section may owe to another an inducement to revolution and insurrection, and it rewards the man who lifts his hands against his government by protection to his property, which it would not otherwise possess, if he can raise his efforts to the dignity of a civil war."

So, also, at the present term, in the case of Masterson v. Howard, 18 Wall. [85 U. S.] 99, the court say that the existence of war "does not prevent citizens of one belligerent from taking proceedings for the protection of their own property in their own courts against the citizens of the other, whenever the latter can be reached by process."

In McVeigh v. U. S., 11 Wall. [78 U. S.] 267, the court holds that an alien enemy may be sued, though he may not have a right to bring suits in our courts, and that when he is sued he has a right to appear and defend, and say: "Whatever may be the extent of the disability of an alien enemy to sue in the courts of the hostile country, it is clear that he is liable to be sued." These decisions cover this case. If the citizen may sue to recover a debt in his own courts due from an alien enemy, he may sue to enforce any other right. Freanor having a right of action, as he claims, against Lee to remove a cloud upon his title, filed his bill in equity for that purpose. The statute of California provided for procuring service against non-residents in such cases by publication of summons, so that service could have been had in a mode provided by law, as well against an alien enemy as against other non-residents. Section 22 of

the California Code of Procedure at the time provided that, "after the filing of the complaint, a defendant in an action may appear, answer or demur, whether summons be issued or not, and such appearance, answer or demurrer shall be deemed a waiver of summons." Before the commencement of the war, complainant (Lee) had empowered Haynes to employ counsel in any matters of litigation that might arise touching his interests in California, as we have seen, and upon the filing of Freanor's complaint, Col. Crockett was employed to appear in the case, which he did. This gave the court jurisdiction, even though complainant, at the time, was an alien enemy. The other questions have been already discussed.

It ought to be added that I find no offer on the part of the complainant in his bill to return the money he has received under the arrangements which he now seeks to set aside. If he demands the lands after the large increase in value which has accrued during the ten years' growth of the city of Oakland, before the commencement of this action, also enhanced by the improvements put upon them by the parties since the transactions set out have occurred, he certainly ought to offer to return the amount of the debt received by him in lieu of the lands. But aside from this defect in the bill, by failing to offer to do equity, I find no ground for equitable relief. On the contrary, I think, under the circumstances shown, the complainant has abundant reason to be satisfied with the acts of his agents and attorneys, and to congratulate himself, that in his efforts to obtain an undue advantage over prior lien-holders, he did not ultimately lose the advantage to which he was justly entitled. The bill must be dismissed with costs, and it is so ordered.