### HOLSTEAD et al. v. PARKER et al.*
(No. 714.)

(Court of Civil Appeals of Texas. Beaumont. Feb. 3, 1922. Rehearing Denied March 8, 1922.)

1. Shipping ⬤294—Sale held complete when buyer paid amount to attaching creditors under arrangements with owner.

Where the owner of a motorboat which had been attached and was advertised for sale for satisfaction of a judgment sold the boat to B. and notified the judgment creditors that, if he paid them $720, they should deliver the boat to him and remit the balance above the amount of the judgment, and B. did pay such amount to the judgment creditors, there was a completed sale of the boat, by virtue of which B. acquired the title.

2. Attachment ⬤294—Judgment ⬤880—One buying boat attached may pay judgment, and is then entitled to possession.

One buying a motorboat which had been attached and was advertised for sale in satisfaction of a judgment had the right to pay off the judgment, and, after paying it, had the right of possession, and neither the judgment creditors nor the sheriff could lawfully withhold the boat from his possession.

3. Judgment ⬤875—Discharged by payment of amount in excess of judgment and costs.

The payment to judgment creditors of an amount in excess of the sum necessary to satisfy a judgment under which an attached motorboat had been advertised for sale extinguished the judgment, and the judgment creditors, after accepting a check for such amount, had no authority to return it on the ground that they did not know the amount of the judgment and costs, without ascertaining definitely whether the check would satisfy their demand, especially where the only uncertain element in the item of costs was the creditor's own charge for acting as caretaker of the attached boat.

4. Judgment ⬤892 — Authority to sell extinguished by payment of judgment before sale.

The payment of a judgment after an order for the sale of an attached motorboat was issued, but before the sale, fully and completely extinguished the judgment.

5. Attachment ⬤195—Sale after payment of judgment void, though sheriff and purchaser ignorant of payment.

A sale of an attached motorboat in satisfaction of a judgment after the judgment was paid was absolutely void, no matter how ignorant or innocent the sheriff or the purchaser may have been.

Appeal from District Court, Orange County; J. T. Adams, Judge.

Action by C. B. Holstead and others against J. N. Parker and others. Judgment for defendants, and plaintiffs appeal. Reversed and remanded, with instructions.

Holland & Holland, of Orange, for appellants.

E. L. Bruce, of Orange, and A. D. Lipscomb, of Beaumont, for appellees.

WALKER, J. This was a suit by appellants, as plaintiffs, against appellees, as defendants, for the title and possession of a motorboat. Appellants seized the boat under writ of sequestration, but it was surrendered to appellees by the sheriff under their replevy bond. The trial was to the court without a jury, and judgment was rendered for appellees. The trial court fixed the value of

the boat at the time it was replevied at the sum of $1,000, and the reasonable rental value of the boat at $6 per day. We make the following statement from the record:

The following agreement was offered in evidence:

"It is agreed in this suit that Thomas S. Plunkett was the owner of the boat sued for on and prior to May 31, 1920; that on April 30, 1918, Weaver & Son obtained in the district court of Orange county, Tex., against Thomas S. Plunkett a judgment which by payment had been reduced to the sum, principal and interest, of $252.13, and that there was in said cause incurred the sum of $341.85, costs, and on May 21, 1920, order of sale issued in said cause, under which the boat in question was advertised for sale by the sheriff of Orange county, Tex., to satisfy said judgment and costs, the sale to be made June 1, 1920; that the judgment and order of sale and advertisement above referred to were all valid and regular, and the total amount for which said boat was being sold was the sum of $593.98 (the judgment, interest, and court costs), and the further costs and charges accruing under order of sale."

We give in full the testimony of Ed Weaver:

"My name is Ed Weaver. I am a member of the firm of Weaver & Son. I am a member of the firm that had a judgment against Thomas S. Plunkett with an attachment lien on a motorboat known as the Thos. S. Plunkett, Jr., herein sued on. I had done some work on that boat and had attached it for the work. We sued Thomas S. Plunkett and obtained judgment against him, and had this boat advertised for sale by the sheriff. I was in charge of the Weaver & Son's work, and was looking after that. That boat was advertised for sale, the sale to be made on June 1, 1920, I believe. Before the sale was made, quite a number of parties came and looked at the boat, and asked me what kind of shape it was in. Several different persons did that. I don't remember whether Mr. Lutcher Brown talked to me about it or not; I think probably he did. I don't think Mr. Holstead ever talked to me about it. As to whether or not I remember the circumstances of the sale of the boat that was made by the sheriff, will say I know it was sold. I was not present at that sale. Before that sale was made and before the day of the sale, I received a telegram from Mr. Plunkett, the owner of the boat. I haven't that telegram. I don't know whether I have it at the yard or not; I am not sure, but I think maybe I have. That telegram from Mr. Plunkett in effect notified me that Mr. Plunkett had sold the boat to the plaintiffs, and that, upon their payment to me of the price, $720, I would retain out of it the amount of my judgment and costs and remit him the balance, and deliver the boat to them. I think that about covers the substance of the telegram. I suppose that telegram was sent to me by Mr. Plunkett. It was signed by him. I received it. After receiving that telegram, I was given a check for the $720, and I accepted that check in good faith. I told Lutcher I didn't know anything about what was to be done with the sale of

the boat; I would take it to Mr. Bruce, who was representing us. I made no complaint about the check. I took the check just as readily as I would have the money. There was no question about Lutcher's check. As to whether or not I took the check in line with the telegram that had been received from Mr. Plunkett, will say I would have taken the check anyway, whether I had gotten the telegram or not. Lutcher brought the check to me to pay for the boat, and I just took the check and gave it to Mr. Bruce. Mr. Bruce was representing me as an attorney. I had gotten the telegram from Mr. Plunkett before he brought me the check. With a lawyer representing me, I took it to the lawyer to settle it. After having received this telegram from Mr. Plunkett that he had sold the boat to the plaintiffs and for me to deliver it to them upon their giving me this sum of $720 in money, they brought this check down which was accepted by me, and I turned the check over to Mr. Bruce, who was my attorney representing me, telling him the facts—just what had been done. As to whether or not I told him at that time what was necessary to be done to carry out that agreement, will say I think that covers what I told him. As to whether or not I made him acquainted with the fact that the judgment was settled by this check, will say I gave it to him to do what was right about it; I didn't know whether it was settled or not. I had nothing further to do than to turn it over to my attorney to do what was right. He was collecting the bill. It was out of my hands. As to whether or not I turned the check over to him in carrying out the statement in the telegram from Mr. Plunkett, will say that was the substance of it. That is all I did. I never paid any further attention to it from that time on. I don't know whether there was anything further to be done by me or by the plaintiffs or by Mr. Plunkett or not. I didn't think there was anything further to be done by me. I didn't know what was to be done by anybody else. In a way, I had my money; in other words, it was secure, I reckon. The check was satisfactory to me. It was just the same as the money. I had possession of money enough to cover it. I had my money in the check that had been given to me by Mr. Brown. That was the day before the sale.

"I did not make delivery of this boat to Mr. Lutcher Brown when he gave me that check. When he gave me the check, I told him I couldn't say anything about it; I would take the check and take it to you as my attorney. When he tendered me the check, as near as I can remember, we were over here where the filling station is now, on the corner. He was sitting in his car and I was in mine. He met me on the street. It wasn't at my place of business. That was about a mile and a half away from where the boat was. As to how I was holding that boat, will say the sheriff had possession of the boat, but had me to take care of it for him. I had been taking care of it for the sheriff ever since this judgment. If the judgment was in April, 1918, then I had had it a little over two years. I did not know how much the sheriff's charge for taking care of the property was going to be at the time he tendered the check to me. I said he gave me the check the day before the sale. I can't remember what time of day it was. I

think it was somewhere around noon or maybe afternoon. It was two or three hours, I think, after he tendered the check to me that I brought the check to you as my attorney. When he gave me the check, I did not go with him down to where the boat was and give him possession of the boat. I did not send him to get possession of the boat. I did not tell him he could get possession of the boat. As to whether or not it is a fact that I told him I would take that check to you and see what should be done about it, will say that is what it all amounted to. All the conversation we had was I told him I would take the check to you and do what was right about it. I did not know at that time that $720 would cover the amount of the judgment, costs, and care of the property. I couldn't say whether I told him or not that the boat was to be sold next day at sheriff's sale. He knew it anyway. He knew it was to be sold. The boat was sold the next day at sheriff's sale, and I received from the sheriff the amount of my judgment. I suppose that telegram was from Mr. Plunkett. It was signed by him. Lutcher Brown did not present to me a bill of sale from Plunkett for the boat. I don't remember whether he said he had one or not; I don't suppose he did. I have not seen a bill of sale from Plunkett to Brown or Holstead for the boat. I haven't seen a bill of sale at all for it. I did not tell the sheriff or any of his deputies about what had transpired between Lutcher Brown and myself. Besides yourself, I did not tell any one that would have anything to do with the case about what transpired between me and Lutcher Brown. I might have told some of my family something of that sort, but I didn't tell any one outside of them. When Lutcher Brown gave me the check, I told him I was going to carry it to you, and you would do what was to be done about it according to law. When he gave me the check, I did not consider the boat was his boat and everything about it was settled. Since I have refreshed my memory about it, I think it was somewhere around 6 o'clock, between 5 and 6, on the day preceding the sale that I came to your office with the check.

"I could have cashed the check the day he gave it to me if I had wanted to. There was nothing to keep me from cashing the check. The check was as good as money if I had wanted to put my signature to it. I did not simply give Mr. Bruce the check to carry out the instructions of Mr. Plunkett; that is, to take out of it the amount of my judgment. I thought it would be in Mr. Bruce's judgment what to do with it. All I wanted out of it was the amount of money that was coming to me, and I wanted the court costs paid, and I wanted the balance of it sent to Mr. Plunkett. I wanted Mr. Bruce to handle it in a legal way carrying out that. Holstead, Joe Miller, and Lutcher Brown took possession of the boat several days afterwards, and moved it. There is several parts of a boat you can take off to keep it from running. I don't know whether they took something off of it to keep it from running or not. I paid no further attention to the boat after I got this check. They moved the boat from where it was. I don't know how many days it was, but that was after the sale. The boat wasn't moved until after the sale. I made no complaint

about it at the time the plaintiffs moved it; I wasn't there. I had no complaint to make on that score.

"Nobody could move the boat until after the sale. After the sale it was immaterial to me what became of it. Mr. Holland asked me if I was concerned about it any more than the amount of my judgment. I was concerned to the amount of charging the sheriff for my services in caring for the boat for him. As to whether or not I gave any instructions down there about not letting that boat go until after the sale, will say it was understood with all of my men that the boat should never be moved until the judgment was settled. After Lutcher Brown gave me the check, I did not tell any of my men to deliver the boat to Lutcher Brown or to Holstead. As to whether or not I stated to my men not to let any one have that boat until it had been sold at sheriff's sale, will say that was the way it was understood always after the suit started. I have never indorsed that check. I did not indorse it when I gave it to you. It is a fact that you stated to me when I gave the check to you that you would hunt up Lutcher Brown and give it back to him. You left the office for that purpose and so stated. I don't think that was over three hours at the most after the check was given to me. After he gave me the check, I had some little business to attend to, and I finished that and went to see you. I couldn't say positively whether I was on my way to my place of business when he gave me the check or not. At any rate, just as soon as I got through attending to whatever mission I was on, I came to your office with the check. I am acquainted with C. L. Adams and J. N. Parker. I was acquainted with them at that time. I did not tell either one of them about what Lutcher Brown had done. They did not know what Lutcher Brown had done. They could have had no way of knowing it.

"I did not cash the check that Brown gave me because I didn't think I had any right to cash it. It was payable to me, but the boat was in the sheriff's hands to sell, and I had an attorney representing me, and I thought the proper thing for me to do was to take the check to my attorney and let him look out after it. I thought it was proper to put it into my attorney's hands, and I would have done whatever he told me to do. I don't think my attorney explained to me why he wanted to give this check back to Lutcher Brown. I think my attorney told me at the time that he didn't know what the costs of the court was going to be. I don't know what that would have to do with turning the check back. That was just the evening before the sale. The sale was made next morning. I don't know what that would have to do with turning the check back. That was just the evening before the sale. The sale was made next morning. I don't know what time. I wasn't in town on the day the sale was made. I didn't even bid on the property. I intended to bid on it, but, when I found out Lutcher would give this much for it, I didn't think it was necessary for me to bid, because I thought that would cover my judgment, and I didn't care to bid on it. I wasn't present at the sale, and didn't have anybody there representing me. I never instructed anybody to bid anything at all. Certainly I would have cared if it hadn't brought but four bits.

"Q. You didn't care whether it brought as much as 50 cents or not; you had your money in this check, and you were perfectly satisfied? A. Well, I don't know. I felt like I was going to get my money. As long as I got my money, I didn't care what became of the boat. I felt like I was going to get my money. I didn't know how I was going to get it.

"Q. You were bound to have thought you were going to get it from the check or from the boat, one, and if you paid no further attention to the boat, where did you expect to get your money? A. From the proceeds of the sale.

"Q. Suppose the sale hadn't brought any amount of money? A. I would have to be satisfied with what I got.

"Q. You were satisfied with the check and that you would get your money out of the check? A. I would get it from somewhere; I didn't know where.

"Q. The giving of the check is what satisfied you as to your getting your money? A. Yes, sir; I was satisfied the sale would bring that much money.

"Q. Because the check had been given for that? A. Yes, sir.

"I should think that boat would have brought anywhere between $700, and maybe $900. That was my idea of the value of the boat at that time. I knew you were my attorney, and that you were protecting me in the collection of the judgment; that you would attend the sale and do whatever was necessary to protect my interests in the sale."

And the direct testimony of Judge E. L. Bruce:

"My name is E. L. Bruce. I am an attorney at law. As attorney for Weaver & Son, a firm composed of Joe Weaver and Ed Weaver, I obtained a judgment against Thomas S. Plunkett with foreclosure of attachment lien on the boat that has been mentioned in the testimony, and under that judgment got out an order of sale, and the boat was duly advertised for sale. The boat was advertised for sale for June 1, 1920. Late in the afternoon preceding that, along about 6 o'clock, Mr. Ed Weaver, of the firm of Weaver & Son, brought to my office this check which has been introduced in evidence, the check of Lutcher Brown, dated May 1, 1920. He didn't indorse the check, but brought it to me with the statement that Mr. Brown had tendered it to him in satisfaction of his judgment, and asked me what to do about it, and at that time I didn't know, except from the recitals in the order of sale, how much the judgment was, nor how much the sheriff's charge for the care of the property would be, and I didn't know whether this check would cover the judgment or not. I asked him if Brown presented him a bill of sale from Plunkett or what evidence he had that this was satisfactory with Mr. Plunkett, and he told me he had received a telegram from Mr. Plunkett, and he had no direct communication from Plunkett except that telegram. I left the office (it was along about 6 o'clock or a little after 6) to hunt Lutcher Brown to give him the check back and tell him the sale was going to be the next day, but I couldn't find him. I phoned to his house, and his wife said he had gone to Palistine. The next day at the sale I bid $720, the amount of this check, for him. I kinder thought I ought to do that. He had tendered that amount. Mr. Charley Adams was at the sale. The boat was down there at Weaver & Son's shipyard, and Mr. Adams and myself and Mr. Harvey were on the boat at the time. I hadn't told Mr. Adams nor J. N. Parker nor any one else about this transaction. So far as I know, no one knew about it except Ed Weaver and myself, and I asked Mr. Weaver if he had turned the boat over to Mr. Brown and he said 'No,' he had told them they must see me about it. He said he had done nothing more than just bring this check to me that had been handed to him, and had not delivered the boat to them. He said he hadn't sold it to them and hadn't done anything except to bring the check to me for me to do what was necessary. That morning before going down to the sale I saw the deputy sheriff, Henry Harvey, who had the matter in charge, to try to find out from him how much the costs would be, and he said that Dick Johnson, the sheriff, would know about that, he wouldn't want to say himself, and he mentioned some amount (I don't remember what it was) that was considerably more than the $720. The $720 wouldn't pay the amount of the judgment. We went ahead, and at the sale, as I say, I bid $720 for Lutcher Brown, not by any instructions or directions from him, but, inasmuch as he had tendered this check for that much, I bid that much for him. After that, on the same day, I wrote the bill of sale for the sheriff to Mr. Adams. Mr. Adams gave Henry Harvey his check for $750, and Mr. Harvey got me to prorate the different costs, and I myself mailed to Mr. Plunkett the check for $117 and some odd cents, the amount of the judgment after satisfying the costs. I had theretofore had some correspondence with Mr. Plunkett and knew this check of Mr. Harvey's bears Mr. Plunkett's signature. I am familiar with his signature, and know this is his. I mailed the check to him. That was on the evening of the 1st of June. That same evening Mr. Parker told me he had bought the boat from Charley Adams, and had me write a bill of sale. A day or two after that Mr. George Holland phoned me he was going to replevy the boat, and I think I found out afterwards that Lutcher Brown or Holstead or some one had gone down to the shipyard and got it, and I thought I would have to bring suit to sequestrate it. Not on the night of May 31st, but on the night of June 1st, after the sale, after I had heard that Holstead or some one had gone down there and got the boat, I spoke to Mr. Holstead about whatever claim they had. I wanted to buy it rather than have to bring suit. I thought at that time I was going to have to be the actor in bringing suit against them. Mr. Parker saw Mr. Johnson, the sheriff, and took him with him and Mr. Johnson gave him possession of the boat. So far as I know, neither Mr. Parker nor Mr. Adams had any notice of the Brown transaction. I didn't tell them. The reason I still have Lutcher Brown's check is I saw Lutcher a day or two after that, after he came back from Palistine or wherever he had gone, and I tendered him the check back, and he wouldn't take it. I was leaving for California, and I put the check in the safety deposit vault at the bank, and it has been there ever since until yester-

day. I got it out yesterday to use as evidence in the case. The check never was cashed, never was indorsed by Weaver & Son, and has not been used."

From the foregoing statement of this case we make the following conclusions:

[1] (1) There was a completed sale of the motorboat by Thos. S. Plunkett to Lutcher Brown, and by virtue of that sale Brown acquired the title to said boat.

[2] (2) By virtue of his purchase of said boat from Plunkett, Brown had the right to pay off the judgment held by Weaver & Son against Plunkett, and, after paying said judgment, he had the right of possession of the boat, and neither Weaver & Son nor the sheriff could lawfully withhold the boat from his possession.

(3) Brown fully complied with his contract with Plunkett when he paid to Ed Weaver the sum of $720, which sum was more than $85 in excess of the amount due on the judgment held by Weaver & Son against Plunkett, principal and interest and all costs incident to that suit, and to the order of sale therein.

[3] (4) The payment of $720 under the facts of this case fully extinguished the judgment held by Weaver & Son against Plunkett. When Weaver accepted the check from Brown, he was without authority to return it without first ascertaining definitely whether said check would fully satisfy his demand. The duty rested on him to give this information to Brown, and he could not shield himself by the statement from his attorney that they did not know the amount of the judgment, principal, interest, and costs. As plaintiff, he was visited with knowledge of that fact. He had accepted Brown's check with the clear understanding that it was in discharge of his judgment and costs, and in fact it was in excess of the amount due on his judgment. As destroying his defense that he did not know the amount of the costs, the only uncertain element in this item grew out of the care for the boat. Weaver himself had been the caretaker during all the time the boat was in possession of the sheriff, and certainly could control his own charges.

(5) From the statement made by us and from the other facts in the record, we conclude that the sheriff sold the boat under the order of sale to C. L. Adams for $750, which was a valuable consideration for the boat; that neither the sheriff nor Adams had any actual knowledge of any fact or circumstances affecting the validity of the judgment or the order of sale or impairing the authority which the sheriff attempted to exercise under the order of sale; that the sheriff executed to Adams a bill of sale to the boat immediately after the sale; afterwards, on the same day, Adams sold the boat to Parker for $1,000, executing to him a bill of sale; that Parker also bought the boat believing he was acquiring a good title thereto, and without any actual knowledge of Brown's claim or of the fact that the judgment had been paid; that neither the sheriff nor Adams nor Parker had any actual knowledge of any fact or circumstance that would have put a reasonably prudent man on inquiry, which, when prosecuted with due diligence, would have led to this discovery of the fact that the judgment had been paid, or of Brown's claim to the property.

[4, 5] (6) The payment of the judgment held by Weaver & Son against Plunkett after the order of sale was issued, but before the sale, fully and completely extinguished the judgment, and the sheriff's authority to sell the boat under the order of sale was extinguished when the judgment was paid. It follows, then, that the sale of the boat after the judgment was paid was absolutely void, no matter how ignorant or innocent the sheriff may have been in making the sale or Adams in buying the boat. This question is not free from difficulty. Our Supreme Court has held that a sale under an execution issued after the judgment was paid is void. Terry v. O'Neal, 71 Tex. 592, 9 S. W. 673. See, also, Hardin v. Clark, 1 Tex. Civ. App. 565, 21 S. W. 977; Davis v. Gott, 130 Ky. 486, 113 S. W. 826. Under the note in Van Campen v. Snyder, 32 Am. Dec. 313 (which case holds that such a sale is voidable and not void), the rule is announced as follows:

"The decided preponderance of authority supports the proposition that a sale under a satisfied judgment is absolutely void, no matter how ignorant or innocent the purchaser may be. Freeman on Judgments, § 480."

On the proposition we quote in full the rule as announced by Corpus Juris, vol. 23, p. 749, § 791:

"The courts are divided upon the question as to the effect upon the title of a bona fide purchaser at an execution sale of the satisfaction of the judgment prior to the sale of the property thereunder. In some jurisdictions, especially in the earlier decisions, the rule is laid down that a bona fide purchaser without notice will acquire a good title, even though the execution is paid off or the judgment satisfied before sale, where the satisfaction does not appear of record at the time of or before the sale. Boren v. McGehee, 6 Port. 432, 31 Am. D. 695; Jones v. Short, 77 A. 968; Capital Bank v. Huntoon, 35 Kan. 577, 11 P. 369; Bishops v. Gregory, 5 B. Mon. 359; Michols v. Dissler, 31 N. J. Law, 461; 86 Am. D. 219; Dean v. Connelly, 6 Pa. 239; Samms v. Alexander, 3 Yeates, 368; Woltjen v. O'Malley, 2 Sawy. 549. However, the better doctrine, as adopted by the more recent decisions, is that the satisfaction of the judgment prior to an execution sale will render such sale void, and the purchaser will take no title thereunder, even though he bought in good faith and without notice. Lynch v. Burt, 132 Fed. 417, 67 C. C. A. 305; Lee v. Rogers, 15 F. Cas. No. 8,201, 2 Sawy. 549;

State v. Prime, 54 Ind. 450; Shaffer v. Mc-Crackin, 90 Iowa, 578, 58 N. W. 910, 48 Am. S. R. 465; Williams v. Gallien, 1 Rob. 94; Kennedy v. Duncklee, 1 Gray, 65; Huff v. Morton, 83 Mo. 399; McClure v. Logan, 50 Mo. 234 (overr. Reed v. Austin, 9 Mo. 722, 45 Am. D. 336); Durette v. Briggs, 47 Mo. 356; Weston v. Clark, 37 Mo. 568; Benton v. Hatch, 122 N. Y. 322, 25 N. E. 486 (aff. 43 Hun, 142, 6 N. Y. S. 213, 25 N. Y. Wkly. Dig. 382); Forst v. Yonkers Sav. Bank, 70 N. Y. 553, 26 A. R. 627 (mod. 8 Hun, 26); Craft v. Merrill, 14 N. Y. 456; Carpenter v. Stilwell, 11 N. Y. 61; Wood v. Colvin, 2 Hill, 566, 38 Am. D. 598; Jackson v. Cadwell, 1 Cow. 622; Swan v. Saddlemire, 8 Wend. 676; Jackson v. Morse, 18 Johns. 441, 9 Am. D. 225; Mouchat v. Brown, 37 S. C. L. 117; Zylstra v. Keith, 2 S. C. Eq. 140; Finely v. Gaut, 8 Baxt. 148; McLiesh v. Bal, 58 Wash. 690, 109 P. 209, 137 Am. S. R. 1087."

We have carefully reviewed all assignments of error and propositions advanced by appellants. For the most part these assail the conclusions of law and fact as filed by the trial court. In so far as the trial court's conclusions of law and fact are against the conclusions reached by us, appellants' assignments of error are sustained. In all other respects they are overruled.

It follows from what we have said that the trial court erred in rendering judgment for appellees. The judgment is therefore reversed, and this cause remanded to the trial court, with instructions to enter judgment for appellants, based on the trial court's valuation of the boat at $1,000, and damages at the rate of $6 per day, the judgment to be framed so as to give all the parties the relief to which they are entitled, where the plaintiff in sequestration recovers the title and possession of the property against the defendant, who has been holding it under a replevy bond. It is our further order that appellants recover from appellees all costs of this appeal, together with all costs in the trial court.

### On Rehearing.

On rehearing appellees have cited Owen v. City of Navasota, 44 Tex. 521, Tierney v. Frazier, 57 Tex. 440, Rippetoe v. Dwyer, 65 Tex. 705, and Harrison v. Sharpe (Tex. Civ. App.) 210 S. W. 734, as holding against our conclusion:

"That the sale of the boat after the judgment was paid was absolutely void, no matter how ignorant or innocent the sheriff may have been in making the sale or Adams in buying the boat."

We do not so construe the cases cited. In Owen v. City of Navasota the Supreme Court said:

"If the judgment had in fact been satisfied in full prior to the sale, there are cases of high authority which hold that the sale is absolutely void, and confers no title on the purchaser, although there was nothing of rec-

ord to show the satisfaction, and the purchaser bought in perfect good faith. Hunter v. Stevenson, 1 Hill (S. C.) 415; Wood v. Colvin, 2 Hill (N. Y.) 566; Johnson v. Caldwell, 1 Conn. 622; Neilson v. Neilson, 5 Barb. 575; Myers v. Cochran, 29 Ind. 256; Trigg v. Ross, 35 Mo. 165.

"It is not our purpose to express any opinion on this proposition, as in this case it is not necessary that we should do so. In its terms it applies only to cases of judgment satisfied in full, and it is believed that its extension to other cases, apparently within its reach, has not been found. Walker v. McKnight, 15 B. Mon. 476; Freeman on Judgments, § 480. * * *

"In questions of this nature, affecting titles to lands, it is proper to follow in the beaten path of authority. But we are not disposed to go beyond the authorities in declaring public sales absolutely void because of matters not apparent of record."

In discussing the proposition in that case, the Supreme Court said that "the distinction between a satisfied judgment and one which is stayed, so far as it affects the authority to sell pending the sale, is not very apparent," but distinguishes the facts of that case from the facts of a case where the judgment has been paid. That case was cited by the Supreme Court in Tierney v. Frazier, supra, the court saying:

"This court has heretofore declined to go beyond the authorities in holding executions void by reason of matters not appearing of record. Owen v. City of Navasota, 44 Tex. 521, 522."

From what was said by the court in the two cases just cited, it would seem that, had the issue been before them, they would have followed the proposition stated by them in Owen v. City of Navasota. On its facts, Tierney v. Frazier is entirely different from the facts in the case at bar. In that case Tierney brought suit against the sheriff for damages, alleging that he had wrongfully levied an execution after the judgment had been satisfied. It seems that Tierney exhibited to the sheriff receipts against the judgment. The court said:

"The judgment against Tierney was several dollars in excess of the amount of the receipt which he held, and the question of its sufficiency to show a satisfaction in full of the judgment would reasonably have suggested itself to the deputy sheriff. * * * With the lights before us, we are not prepared to say that the execution was invalidated by reason of the payment made and receipts given. But, however this may be, we are satisfied that the deputy sheriff was legally justified in declining to pass upon the genuineness and validity of the receipts held by Tierney, and in proceeding to make a levy, and that by so doing he did not subject himself to any action by Tierney for damages."

Rippetoe v. Dwyer has no bearing on this case. The issue there was whether the notes on which the suit had been brought were

paid before judgment. On the issue in that case the court said:

"If Rippetoe had knowledge that the debt which Pressley once owed had been fully paid, then he can stand on no higher ground than would the person in whose name the action was prosecuted to final judgment. It is true, as between the plaintiff in that action and Pressley, the judgment rendered is conclusive of the rights of themselves, for they were parties to it, and must be bound by it, unless it be in some lawful method set aside; but, not so, as to Dwyer, who was not actually a party to that action, and who is sought to be affected by a rule which cannot exist in this case, if the facts alleged by Dwyer be true."

Harrison v. Sharpe involved the validity of a judgment and sale thereunder where the sufficiency of the citation was at issue.

Though we have given the very able argument of appellees' counsel our most careful consideration, we cannot escape the conclusion that we correctly disposed of this case on original submission. The motion for rehearing is therefore in all things overruled.