## THE CAPITAL BANK OF TOPEKA, *et al.*, v. ANDREW J. HUNTOON.

1. SHERIFF'S SALE; *Irregularities, Cured; Matters, Not Cured.* Mere irregularities in the proceedings connected with a sheriff's sale are cured by the order of the court, made some considerable time afterward, confirming the sale; but matters which are not mere irregularities, or which form no part of the proceedings connected with the sale, as, for instance, fraudulent combinations which might prevent a fair and equitable sale, and matters relating to the ownership of the property sold, are not cured nor finally or conclusively determined by the order confirming the sale.

2. REVIEWABLE IRREGULARITIES; *Action to Set Aside Sale.* Irregularities affecting a sheriff's sale may be examined in the district court on motion to confirm the sale, or to set aside the sale. Some of such irregularities may also be reëxamined in the district court by proceedings under §§ 568 to 580 of the civil code; and all such irregularities, so far as they are shown by the record, may be reëxamined on petition in error in the supreme court; and in some particular cases of fraud and irregularity, parties may have an action in the district court in the nature of a suit in equity to set aside a sheriff's sale, and for such other and further relief as justice and equity may

37— 35 KAS.

| | |
|---|---|
| 35 | 577 |
| 36 | 439 |
| 36 | 440 |
| 35 | 577 |
| 40 | 230 |
| 35 | 577 |
| 41 | 332 |
| 42 | 383 |
| 35 | 577 |
| 43 | 276 |
| 35 | 577 |
| 55 | 484 |
| 35 | 577 |
| 57 | 834 |
| 35 | 577 |
| 61 | 480 |
| 35 | 577 |
| 62 | 531 |

authorize. But whatever remedy the aggrieved party may choose, he must resort to the same within proper and reasonable time.

3. SHERIFF'S SALE; *Agreement to Bid; Sale, Not Set Aside.* Although combinations which might prevent competition at sheriff's sales are always looked upon by courts with great disfavor, yet where no combination was made except that the several judgment creditors appointed one of their number as agent to attend the sheriff's sale and purchase the property in his own name, and for their benefit, unless it was sold for more than he wished to pay; and there was no agreement, arrangement or understanding between the judgment creditors that would prevent any one of them, or any other person, from bidding for himself; and the agent appeared at the sale and purchased the property as agreed: *Held,* Under the circumstances of this case, that the aforesaid agreement would not of itself and alone be sufficient to authorize the judgment debtor, more than a year after the sale was made, and several months after it was confirmed, and after the sheriff's deed was executed, and after some of the property had been sold to innocent purchasers, to commence and maintain an action in the nature of a suit in equity to set aside the sheriff's sale.

4. ———— *Old Appraisement; Sale, Not Voidable.* A sale of real estate by a sheriff upon a second offer of sale under an appraisement four years old, is not for this reason alone void, nor is it voidable in this action.

5. ———— *Inadequacy of Price.* Inadequacy of price, taken alone, is seldom, if ever, sufficient to authorize the setting aside of a sheriff's sale; but that ground, with others, is sometimes sufficient.

6. ———— *Void Sale.* Where appraisement has not been waived and real estate is sold at sheriff's sale for less than two-thirds of its appraised value, the sale is void.

7. SEVERAL JUDGMENTS; *Payment of One before Sale.* Where a sheriff's sale is made to satisfy the judgments of several judgment creditors, and the judgment of one of such creditors has previously been paid, but the amount for which the property was sold is not enough to satisfy the other judgments, *held,* that the fact that one of the judgments had previously been paid, will not of itself render the sale void or voidable; but the judgment creditor whose judgment has been paid should not be allowed to receive any portion of the proceeds of the sale.

8. EXECUTION; *Judgment, When Not Dormant.* Where an action was commenced by a judgment creditor against the judgment debtor to subject certain property to the payment of the debts of such judgment debtor, and another judgment creditor was made a party to the suit within less than five years after such second judgment creditor's judgment was rendered, and in the above-mentioned action judgment was finally rendered in favor of both the judgment cred-

itors and against the judgment debtor, and an execution was issued thereon within less than five years after this last-mentioned judgment was rendered but more than five years after an execution had been issued in favor of the second judgment creditor on his first judgment, and the property was sold on such execution, *held*, that the judgment of the second judgment creditor is not dormant to the extent of depriving him of participating in the proceeds of the sheriff's sale.

9. FINDING, *Sustained.* The district court held that still another judgment creditor had the right to participate in the proceeds of the sheriff's sale; and nothing appearing to the contrary, and none of the judgment creditors objecting, such holding must be sustained.

10. JUDGMENT CREDITORS—*Combination; Setting Aside Sale; Innocent Purchasers.* Where, at a sheriff's sale, the property was sold at only about one-fourth of its actual cash value, and a part of the property was sold in violation of law at less than two-thirds of its appraised value, and the appraisement itself had been made more than four years prior to the sale, and at a time when the price of property was very low, and an agreement was made among the several judgment creditors that one of their number, as their agent, should have authority to purchase the property for them, and he did so purchase the property, which agreement might have induced the other judgment creditors not to bid; and one of the judgments for the payment of which the property was sold had previously been paid: *Held*, That, taking all things together, they are sufficient to authorize the setting aside of the sheriff's sale in an action brought for that purpose, with reference to all lots which still remain in the hands of the judgment creditors and have not been sold or transferred by them to innocent purchasers.

11. LACHES—*Sale, When Not Set Aside.* But where the judgment debtor was guilty of *laches* in not resorting to the ordinary remedies to set aside the sale, but waited more than a year after the sale and a long time after the confirmation of the sale, and after the sheriff's deed had been executed, and after some of the property had been sold and conveyed to innocent purchasers, before he commenced any action to question the regularity validity or fairness of the sale, and then commenced an action in equity to set aside the sale, *held*, that the sale cannot be set aside with regard to the property sold and conveyed to innocent purchasers; and with regard to such property the judgment debtor has no remedy.

12. TAXES—*Condition of Setting Aside Sale.* And where the judgment creditors after the sale paid a large amount of taxes due on the property sold, *held*, that the sale should be set aside only upon the condition that such taxes be paid by the judgment debtor or out of the proceeds of another sale of the property.

Capital Bank v. Huntoon.

13. RECORD, *as Evidence; Presumptions.* A part of a record will gen-
  erally prove what it purports to prove, but cannot prove more than
  that, and no liberal presumptions can be entertained or resorted to
  for the purpose of supplying omissions, aiding deficiencies, or ex-
  tending the import of its language. It is only when the whole of
  the record is introduced in evidence that liberal presumptions can
  be invoked to aid the record.

### *Error from Shawnee District Court.*

ACTION brought by *Andrew J. Huntoon,* against *The Cap-
ital Bank of Topeka* and others, to set aside a certain sheriff's
sale, and for other relief. Trial at the January Term, 1884,
before Hon. JOHN W. DAY, judge *pro tem.,* and a jury;
judgment for the plaintiff. The defendants bring the case to
this court. The opinion contains a sufficient statement of the
facts.

*J. G. Slonecker,* and *W. C. Webb,* for plaintiffs in error.

*W. P. Douthitt, C. M. Foster, Foster & Haywood,* and
*Waters & Chase,* for defendant in error.

The opinion of the court was delivered by

VALENTINE, J.: This was an action brought in the district
court of Shawnee county by Andrew J. Huntoon against the
Capital Bank of Topeka, Arthur Quick, the Topeka Bank,
(formerly known as the Topeka Bank and Savings Institution,)
John R. Mulvane, Joseph Black, Willis Norton, and N. C.
McFarland, to set aside a sheriff's sale, and for other relief.
The case was tried before the court and a jury, and both the
court and the jury made special findings of fact, and the court
made one conclusion of law, and upon such findings and con-
clusion the court rendered judgment in favor of the plaintiff
and against the defendants. The defendants bring the case to
this court.

Among the admitted facts of the case are the following:
In 1873, Joel Huntoon & Son were largely indebted to va-
rious persons and corporations, among which were the
Capital Bank, the Topeka Bank, the Mastin Bank, Arthur

Quick, and Joseph Black & Son, and as to these creditors named, A. J. Huntoon, the brother of Joel Huntoon, was the surety of Joel Huntoon & Son. At the same time, Joel Huntoon was the owner of a large number of lots in Huntoon's addition to the city of Topeka; and to secure A. J. Huntoon, his surety, he, with his wife, on December 23, 1873, conveyed these lots, about 119 in number, to A. J. Huntoon. Afterward, judgments were rendered on the foregoing claims against Joel Huntoon & Son, as principals, and A. J. Huntoon, as surety, as follows: In favor of the Capital Bank, on December 30, 1874, for $645.72; in favor of Arthur Quick, on December 30, 1874, for $554.50; in favor of the Mastin Bank, on March 9, 1875, for $9,992.14; in favor of Joseph Black & Son, on May 13, 1875, for $1,197.69; and in favor of the Topeka Bank, on March 15, 1876, for $862.09. The judgments in favor of the Capital Bank, Arthur Quick, Joseph Black & Son and the Topeka Bank were rendered in the district court of Shawnee county, Kansas, and the judgment in favor of the Mastin Bank was rendered in the circuit court of the United States for the district of Kansas. On July 19, 1875, the Capital Bank brought an action in the district court of Shawnee county in the nature of a creditors' bill, against Joel Huntoon and wife, A. J. Huntoon, Arthur Quick, Joseph Black & Son, and other judgment creditors of Joel Huntoon & Son, and of Joel Huntoon, but did not include in this action the Topeka Bank or the Mastin Bank, and asked that the liens of the several parties might be adjusted, and that the conveyance made by Joel Huntoon and wife to A. J. Huntoon in 1873 be declared a mortgage and set aside, and that the property be ordered to be sold to pay the debts of the Huntoons. On December 15, 1875, the Mastin Bank was made a party defendant, and on that day it filed its answer. On February 12, 1876, a judgment was rendered in the action, adjudging and decreeing that the deed executed by Joel Huntoon and wife to A. J. Huntoon was a mortgage, and that the real estate therein described should be sold, and that the proceeds of the sale should be applied in payment of the judg-

ments in favor of the Capital Bank, Joseph Black & Son, Arthur Quick, and the Mastin Bank, *pro rata* among themselves, but in priority to the other judgment creditors, and that if there should be any excess after paying those four judgments, the excess should be applied in payment of the judgments of the other judgment creditors as their respective priorities might afterward be determined, and directing that an order of sale should be issued to the sheriff of Shawnee county, commanding him as upon execution to appraise and sell the real estate and make a return of his proceedings into court.

On March 22, 1876, an order of sale was issued and the aforesaid lots were appraised, and on May 8, 1876, the order of sale was returned — no sale having been made, for want of bidders. On July 22, 1876, an *alias* order of sale was issued, and on August 31, 1876, a like return was made. On September 2, 1876, a third order of sale was issued, and the old appraisement was set aside and a new appraisement was ordered to be made, and on September 14, 1876, was in fact made, and afterward the order of sale was returned as the others had been before — no sale having been made, for want of bidders. On September 19, 1879, the Topeka Bank applied to be made a party defendant to the aforesaid action with leave to answer, which application was granted; and it filed its answer setting up its judgment and claiming priority over the other judgment creditors. In the mean time the Capital Bank and the Mastin Bank had ceased to do business, and N. C. McFarland and Willis Norton had become the owners of the Capital Bank judgment, and Arthur Quick, John R. Mulvane and Willis Norton had become the owners of the Mastin Bank judgment. On September 4, 1880, a fourth order of sale was issued, and the sheriff proceeded to advertise and sell the property under the previous appraisement of September 14, 1876, and on October 18, 1880, sold all the foregoing lots to Arthur Quick. On December 18, 1880, the sale was confirmed and the priorities were again determined; and it was ordered that the proceeds of the sale, after deducting the costs, should be ap-

plied *pro rata* as credits upon the judgments rendered in favor
of the Mastin Bank; the Topeka Bank, the Capital Bank,
Arthur Quick, and Joseph Black & Son.   On March 1, 1881,
the sheriff duly executed a deed to Arthur Quick for all the
foregoing lots, which deed was duly recorded.   Arthur Quick,
in purchasing the property and taking a deed to himself, acted
as the agent for all the above-mentioned judgment creditors,
and after the sheriff's deed was executed the property was
divided *pro rata* among such judgment creditors precisely as
the money would have been divided among them had Quick
purchased the land for himself alone, and had paid cash there-
for to the amount of his bid; and Quick conveyed to each of
the judgment creditors his or its *pro rata* share of the prop-
erty, and each of such judgment creditors paid his or its pro-
portion of the costs and of the taxes then due against the
property.   These taxes were evidenced by tax-sale certificates
and tax deeds held by J. R. Mulvane, who transferred his tax
interests in and to the property to the parties respectively who
obtained the property.   Some of the lots obtained in this
manner were sold and conveyed by the parties receiving them
to innocent purchasers, but the greater portion of them still
remains in the hands of the several judgment creditors or their
representatives.   On November 22, 1881, A J. Huntoon in-
stituted this present action.   It was tried in July, 1883, and
was finally decided in the court below on March 29, 1884.

Upon the foregoing facts and some others, the court below
found as a conclusion of law that the sheriff's sale was "void,
and should be held for naught."   The court, however, did not
render any judgment setting aside the sale.   The judgment
that was in fact rendered was that the sheriff's deed and the
deeds from Quick to the other judgment creditors conveying
the lots which such judgment creditors still hold and have not
yet sold or disposed of, should, as to such lots, be set aside and
held for naught, and the title to such lots should be reinvested
and replaced in Joel Huntoon, subject to the payment of his
debts for which Andrew J. Huntoon is surety; and the sher-
iff's deed and the deeds to such of the lots as had been sold

by the judgment creditors to innocent purchasers were with respect to such innocent purchasers' lots allowed to remain in full force and to be valid, and an amount equal to the value of such lots sold to innocent purchasers, as such value was shown by the evidence to be, on November 1, 1881, was credited on the judgments of the Capital Bank, the Topeka Bank, the Mastin Bank, and Joseph Black & Son, leaving a portion of such judgments still unpaid, which was ordered to be paid by the Huntoons, or that the lots so reinvested and replaced in Joel Huntoon should be sold as on execution to pay the same; and the Arthur Quick judgment was ordered and adjudged to be discharged and satisfied. Now while the court below did not set aside the sheriff's sale at all, and did not set aside the sheriff's deed, nor the deeds from Arthur Quick to the judgment creditors, except with respect to a portion of the lots sold, yet we think the question of the validity of the sheriff's sale is involved in this case; and indeed, it is the main and principal question involved in the case. If the sale is valid, everything is valid. There is no defect or infirmity in or affecting any of the other proceedings, except those which are supposed to render the sale void. The defendant in error, A. J. Huntoon, claims that the sale is void for various reasons, as follows: (1) There was a fraudulent combination among the judgment creditors to prevent competition at the sale; (2) the sale was made upon an appraisement of the property made more than four years prior to the sale; (3) the sale was for a grossly inadequate price; (4) eight of the lots were sold at less than two-thirds of their appraised value; (5) J. R. Mulvane, who partially represented two of the judgment creditors, held tax titles on some of the lots at the time of the sale; (6) Arthur Quick's judgment had been previously paid; (7) the Mastin Bank judgment was dormant at the time of the sale; (8) the Topeka Bank was not a party to the suit until after the judgment of February 12, 1876, subjecting the lots to the payment of the judgment creditors' claims, had been rendered.

On the other hand, the plaintiffs in error, defendants below,

claim that the sheriff's sale is valid; that the sheriff's deed is valid; that the deeds from Quick to the judgment creditors are valid; that Quick's judgment was not paid; that there was no fraudulent combination, nor any fraud on the part of the judgment creditors or their representatives; and that the judgment of the court below should be reversed for various reasons, among which are the following: (1) The plaintiff below mistook his remedy; his remedy being first to resist the confirmation of the sheriff's sale and to move to set it aside, and afterward, if unsuccessful, to commence a proceeding under §§ 568 to 580 of the civil code, which provide for reversing, vacating or modifying judgments or orders in the same courts in which they are rendered; and in either case, if unsuccessful to appeal to the supreme court; (2) that by virtue of the confirmation of the sheriff's sale all the substantial matters and things attempted to be litigated in this action were adjudicated and became and were *res adjudicatæ* before this action was commenced; (3) no complete record was introduced in evidence on the trial of this case, but only portions of certain records, which were introduced over the objections of the defendants below; (4) the finding that Quick's judgment was paid is against the evidence; (5) no fraud or collusion on the part of the judgment creditors was shown by the evidence nor found by the court or jury; (6) no finding was made that the sheriff's deed or any one of the deeds from Quick to the judgment creditors was void; (7) no judgment was rendered setting aside the sheriff's sale; (8) if Quick's judgment was in fact paid, such payment should not affect the rights nor result to the injury of the other judgment creditors; (9) when the sheriff's deed and the deeds from Quick to the other judgment creditors were partially set aside, the title to the lots should not have been vested in Joel Huntoon as it was, for he was not a party to the action; (10) and such title should not have been vested in Joel Huntoon for the payment of his individual debts, as it seems it was, but should have been made subject only to the payment of the debts of the firm of Joel Huntoon & Son; (11) no accounting between the judgment creditors

and the Huntoons should have been had or ordered in this action, as Joel Huntoon & Son were not parties to the action; and if the sheriff's deed was set aside and not the sale, then the sheriff should have been ordered or permitted to execute another deed; but if both the deed and the sale were set aside, then the court should have ordered or permitted another order of sale to be issued and the property be again sold to satisfy the judgments; (12) but if such an accounting should have been had, then the judgment creditors should not have been charged with the value of the lots sold to innocent purchasers, estimated arbitrarily as of the date of November 1, 1881; (13) it was against equity, and erroneous, to vest the title to some of the lots in Joel Huntoon, and to charge the full value of all the other lots to the judgment creditors, freed from all the taxes paid by J. R. Mulvane and the judgment creditors, and to deprive the judgment creditors, including Quick, of all compensation for the taxes paid by them, and taxes which the Huntoons should have paid; (14) time should not have been given to Joel Huntoon & Son to pay the remainder of the judgment, as they were not parties to the suit.

We shall now proceed to consider the various questions presented to us by the parties to this action, but we shall not consider them in the order as heretofore stated.

I. The plaintiffs in error, defendants below, claim that the defendant in error, plaintiff below, has mistaken his remedy; that by his *laches* he has lost his proper remedies, and that he is now pursuing a wrong one. The property in this case was sold on October 18, 1880. It had previously been advertised for sale, and the plaintiff in this action had full, complete and *actual* notice of the sale. He knew that the property was to be sold on that day; and yet he made no appearance at the sale and did not in any manner resist the same. The sale was not confirmed until December 18, 1880, just two months after the sale; and yet the plaintiff did not appear at that time nor at any other time, to resist the confirmation of the sale, or to make any motion to have it set aside. The sheriff's deed was not executed until March 1, 1881, more

than four months after the sale, and more than two months after the confirmation of the sale; and yet the plaintiff did not question the validity, regularity or fairness of the sale, nor did he commence any proceeding to overturn or defeat the sale until he commenced this action on November 22, 1882, more than one year after the sale, nearly one year after the confirmation of the sale, and nearly nine months after the sheriff's deed was executed. And he never appealed to the supreme court to have the order of the district court confirming the sheriff's sale reversed, vacated, or modified. The defendants below claim that the plaintiff has slept upon his rights, and that he cannot now maintain this action *in equity* to obtain the relief he now asks; that he has lost his remedy by his own *laches,* and that he now has no remedy. We shall consider this question along with the next question.

II. The plaintiffs in error, defendants below, also claim that the subject-matter of this action has been finally and conclusively determined by the order of the district court confirming the sheriff's sale, and that the entire question as to whether such sale was formal or informal, legal or illegal, valid or invalid, has been finally settled and is now *res adjudicata.* We think it is true that, with respect to some of the questions involved in this case, or in any case, the confirmation of a sheriff's sale is a final and conclusive adjudication. (*Paine v. Spratley,* 5 Kas. 525; *Bowman v. Cockrill,* 6 id. 311; *Cross v. Knox,* 32 id. 725; *Dickens v. Crane,* 33 id. 344; *Pritchard v. Madren,* 31 id. 39–49, *et seq.*) But with respect to many other questions, the confirmation of a sheriff's sale cannot be regarded as conclusive or as *res adjudicata.* (*Koehler v. Ball,* 2 Kas. 161; *White-Crow v. White-Wing,* 3 id. 276; *Benz v. Hines,* 3 id. 390; *Treptow v. Buse,* 10 id. 170, 179, 180; *Rice v. Poynter,* 15 id. 264, 268; *Harrison v. Andrews,* 18 id. 535; *Halsey v. Van Vliet,* 27 id. 477.) We think the substance of the foregoing decisions is that all mere irregularities in the proceedings connected with a sheriff's sale are cured by the order of the court, made some considerable time afterward, as in this case, confirming the sale. (See also Rorer on Judicial

Sales, § 329; Freeman on Executions, § 311, latter part, and § 307.) But matters which are not mere irregularities, or which form no part of the proceedings connected with the sale, as, for instance, fraudulent combinations which might prevent a fair and equitable sale, and matters relating to the ownership of the property sold, are not cured nor finally or conclusively determined by the order confirming the sale. Irregularities affecting a sheriff's sale may be examined in the district court on a motion to confirm the sale or to set aside the sale. Some of such irregularities may also be reëxamined in the district court by proceedings under §§ 568 to 580 of the civil code, (*Wheatley v. Terry,* 6 Kas. 427;) and all such irregularities, so far as they are shown by the record, may be reëxamined on petition in error in the supreme court. (*Koehler v. Ball,* 2 Kas. 160, 169; *Challiss v. Wise,* 2 id. 193; *White-Crow v. White-Wing,* 3 id. 276; *Moore v. Pye,* 10 id. 246; *N. E. M. S. Co. v. Smith,* 25 id. 622.) But notwithstanding all these remedies, parties may in some particular cases of fraud and irregularity have an action in the district court in the nature of a suit in equity to set aside a sheriff's sale, and for such other and further relief as justice and equity may authorize. (*Cocks v. Izard,* 74 U. S. 559; *Troup v. Wood,* 4 Johns. Ch. 229; *Hamburg Mfg. Co. v. Edsall,* 1 Halst. 249.) The more summary remedies are not always adequate, and sometimes on account of particular circumstances the aggrieved party cannot well resort to such remedies even if they were adequate. But whatever remedy the aggrieved party may choose, he must resort to the same within proper and reasonable time. (*Spafford v. Beach,* 2 Doug. 150; *Prather v. Hill,* 36 Ill. 402; *Noyes v. True,* 23 id. 503; *Rigney v. Small,* 60 id. 416; *McKinneys v. Scott,* 1 Bibb, 155; *Bristow v. Payton,* 2 T. B. Mon. 91; *Cunningham v. Felker,* 26 Iowa, 117; *Daniel v. Modawell,* 22 Ala. 365; *Hancock v. Metz,* 25 Tex. 205; *Vanduyne v. Vanduyne,* 16 N. J. Eq. 93; *Ingram v. Belk,* 2 Strob. 207.)

III. There was no unlawful or fraudulent combination among the judgment creditors or their representatives to prevent competition at the sheriff's sale. The agreement between

the judgment creditors was in fact that Arthur Quick should represent their interests at the sheriff's sale, and should have the authority to bid for and purchase the property for them in his own name, unless it should be sold for more than he wished to pay, and that after the sale was confirmed and the deed made to him for the property which he purchased, the property should be divided between them *pro rata*, and that J. R. Mulvane, who partially represented two of the judgment creditors, and who held certain tax deeds and tax-sale certificates against the property, or a portion thereof, should transfer his tax interests for their agreed value to the judgment creditors respectively who might finally obtain the property upon which he held such tax interests. Arthur Quick was the only person who was given authority to bid on the property in the interest of all the judgment creditors as a body; but each one of the judgment creditors had a right to bid for himself or itself. At three different times previous to this sale, this property had been offered for sale by the sheriff, on three different orders of sale, and could not be sold for want of bidders, and evidently the judgment creditors intended that it should be sold this time if they had to purchase it themselves, and they made this arrangement for that purpose. But there was no agreement, arrangement or understanding between them that would necessarily prevent any one of them from bidding for himself or itself at the sale, if he or it had so chosen, or that would necessarily prevent any other person or corporation from bidding. None of the judgment creditors, however, except Quick, purchased any of the property, and none of them made any bid thereon except Quick and J. R. Mulvane, who in part represented two of the judgment creditors. The other judgment creditors may possibly have refrained from bidding because of this arrangement. But there is nothing in the record, however, except the fact that Quick purchased all the property, and that but few bids were made except by him, that tends to show that this agreement or arrangement had the effect to prevent or did prevent any person from bidding. We do not think that

this agreement or arrangement of itself furnishes · sufficient ground to set aside the sale *in this proceeding;* and whether it would have furnished sufficient ground to set aside the sale if a motion had been made by the plaintiff in the proper court for that purpose before the sale was confirmed, before the sheriff's deed was executed, before any rights of innocent purchasers had intervened, we do not think that it is necessary to express any opinion; for no such motion was made. Combinations which might possibly prevent competition at sheriff's sales are always looked upon by courts with great disfavor; and courts sometimes go very far to set aside sheriff's sales for such reasons, when the application is made in proper time. (Freeman on Executions, § 297, and cases there cited; *Hamburgh Mfg. Co. v. Edsall,* 1 Halst. 249; *Morris v. Woodward,* 25 N. J. Eq. 32; *Underwood v. McVeigh,* 23 Gratt. 409, 422; *Gardner v. Morse,* 25 Me. 140; *Cocks v. Izard,* 74 U. S. 559, 562; *Atcheson v. Mallon,* 43 N. Y. 147; *Troop v. Wood,* 4 Johns. Ch. 229, 254; *Jones v. Caswell,* 3 Johns. Cases, 29; *Packard v. Bird,* 40 Cal. 378, 383.) It was the opinion of the trial court, as well as it is of this court, that the sale cannot be set aside in this proceeding for the sole and simple reason that there was an illegal or fraudulent combination to prevent competition at the sale; for whatever the effect of the agreement may have been, the agreement was not in fact fraudulent or illegal.

IV. The sale was made upon an appraisement of the property which had been made more than four years prior to the time of the sale, and therefore and for this reason it is claimed that the sale is void. We think differently. The property had been offered only once for sale under this appraisement, and there is no statute authorizing another appraisement to be made until after the property had been offered for sale a second time under any particular appraisement. (Civil Code, § 468.) Of course the sale should follow very soon after the appraisement, for otherwise the property might be worth vastly more at the time of the sale than it was at the time of the appraisement. Such was the fact in this present case. In this con-

nection, see *Ayres v. Duprey*, 26 Tex. 593, 601. It is probable that the court in cases like this would be justified in ordering a second appraisement before the property had been offered twice for sale under the first appraisement; and certainly in cases where the sale is made at such a great length of time after the appraisement, the judgment creditor should be required at his peril to see that the property is sold at a fair price. We think, however, that in the absence of fraud or great hardship no sale should be held to be void or even voidable in an action like this, simply because it was made a long time after the appraisement was made. As to what should have been done if a motion had been made in proper time to set aside the sale, we express no opinion.

V. It is also claimed that the sale is void for the reason that the property was sold at a grossly inadequate price. Such a ground taken alone is seldom if ever sufficient to authorize the setting aside of a sheriff's sale. (*Moore v. Pye*, 10 Kas. 246; *Dewey v. Linscott*, 20 id. 684; *Northrop v. Cooper*, 23 id. 433, 441; *Savings Bank v. Marsh*, 31 id. 771, 773; *McGeorge v. Sease*, 32 id. 387, 390, 391.) Though that ground with others is sometimes sufficient. (*Dewey v. Linscott*, 20 Kas. 684; *Weir v. Ins. Co.*, 32 id. 325; Freeman on Executions, § 309, and cases there cited.) All the lots except eight, and there were about 119 in all, were sold for more than two-thirds of their appraised value. We shall have more to say with regard to these eight lots hereafter. With respect to those lots which were sold for more than two-thirds of their appraised value, we think the sale cannot for mere inadequacy of price be set aside in this proceeding. We shall have more to say hereafter with respect to this point, in connection with the other points.

VI. It is further claimed that eight of the lots were sold for less than two-thirds of their appraised value, and therefore and for this reason that the sale is void. There was no express waiver of appraisement in this case, and no implied waiver unless the facts of this case show it. Undoubtedly the sale of these eight lots would have been set aside if a mo-

tion for that purpose had been made in the district court within proper time; but no such motion was made. The sale might also have been set aside under § 568, subdiv. 3, of the civil code, if a proper motion had been made therefor in proper time and before any intermediate rights of innocent purchasers had come into existence; but no such motion was made. The question then arises: Can the sale be set aside or held for naught in this proceeding? This question may be considered in two aspects: First, is the statutory requirement that the property shall not be sold for less than two-thirds of its appraised value a jurisdictional matter? or, second, is such requirement a mere direction to the officer, which he should follow, but the non-observance of which will not render the sale void but only voidable at the option of a party interested in having the sale set aside? The sale of these lots for less than two-thirds of their appraised value was evidently a mere oversight. No fraud in this respect was shown or found; but still the sale was in violation of law. Section 455 of the civil code provides, among other things, that "no such property [meaning any kind of real estate] shall be sold for less than two-thirds of the value returned in the inquest." Nearly all the authorities having application to this question hold, under similar statutes, that such sales are absolutely void. (*Gantly v. Ewing,* 44 U. S. 707; *Collier v. Stanbrough,* 47 id. 14; *Smith v. Cockrill,* 73 id. 756; *Succession of Hilligsberg,* 1 La. An. 340; *Baird v. Lent,* 8 Watts, 422; *Wolf v. Payne,* 35 Pa. St. 97; *Gardner v. Sisk,* 54 id. 506; *Strouse v. Drennan,* 41 Mo. 289; *Sprott v. Reid,* 3 G. Greene, 497; *Maple v. Nelson,* 31 Iowa, 322; *Harrison v. Doe,* 2 Blackf. 1; *Morse v. Doe,* 2 Ind. 65; *Babcock v. Doe,* 8 id. 110; *Davis v. Campbell,* 12 id, 192; *Cummins v. Pfouts,* 13 id. 144; *Evans v. Ashby,* 22 id. 15; *Fletcher v. Holmes,* 25 id. 458; *Tyler v. Wilkerson,* 28 id. 450.) There may be cases where this rule is not strictly adhered to. (*Allen v. Parish,* 3 Ohio, 188; *Williams v. Hickman,* 2 Harr. 463; *Wray v. Miller,* 20 Pa. St. 111; *Sydnor v. Roberts,* 13 Tex. 598; *Ayres v. Duprey,* 27 id. 593; *Shaffer v. Bolander,* 4 G. Greene, 201.)

Under the great weight of authority, we think it must be held that the sale of these eight lots is void, and that such sale must be held to be void in this present action, or in any action or proceeding.

It is also claimed that the sale should be held void because J. R. Mulvane, who partially represented two of the judgment creditors, held tax titles on some of the lots at the time of the sale. We fail to perceive any sufficient ground for this point, and of course it must be overruled.

VII. It is also claimed that the sale is void for the reason that Arthur Quick's judgment had been paid prior to the sale. Now the jury found that such judgment had been paid, and the court below followed such finding and made a similar finding itself, and yet it would seem to us that the preponderance of the evidence is on the other side. From sometime in October, 1876, up to February, 1877, conversations were had between Quick and Joel Huntoon from which it is claimed on the part of the Huntoons that the judgment was paid, and the testimony of Joel Huntoon, corroborated in part by F. R. Huntoon, his son, tends to sustain such claim, and in the absence of other proof is amply sufficient to sustain the same; while, on the other hand, Arthur Quick testified on the trial that the judgment had never been paid. The court and jury found that such a payment had been made in February, 1877. The supposed payment was as follows: In 1872, which was prior to the time when Huntoon & Son became embarrassed, Joel Huntoon sold four lots to Abraham Warren, on credit, and entered into a written contract with Warren to convey such lots to Warren whenever the purchase-price therefor should be paid. On February 13, 1877, Warren assigned this contract to Quick, and Quick took possession of the property. Afterward, Quick sold his interest in the lots to George M. Hammel; and it is now claimed by the Huntoons that Joel Huntoon paid Quick's judgment by releasing to Quick the purchase-price still remaining due on these lots. There is no writing, however, that shows that such judgment has ever been paid. No deed or written transfer of the lots has ever

38 — 35 KAS.

been made by Huntoon to Quick or to Quick's assignee. Quick never delivered the written contract between Huntoon and Warren to Huntoon. No entry of satisfaction or payment of the judgment has ever been made. No receipts were ever given, nor have any passed between Huntoon and Quick. No notice of the payment was ever given to the other judgment creditors. And, indeed, nothing has ever occurred aside from said conversations that would tend to show that the judgment has ever been paid. After this supposed payment, and on August 17, 1878, Joel Huntoon & Son filed a petition in the United States district court for the district of Kansas, asking that they might be adjudged bankrupts, and be finally discharged as such under the laws of the United States, and connected with this petition they filed a schedule, sworn to by each of them, showing that Quick's judgment had not been paid, but was still a valid and subsisting judgment.

Now, notwithstanding all these facts and circumstances, which tend to disprove the findings of the court below and the jury that the judgment in favor of Quick had been previously paid, still there was sufficient evidence to sustain the finding of the court and jury; and we shall therefore decide this case upon the theory that Quick's judgment had in fact been paid prior to the sheriff's sale. This, however, cannot materially affect the substantial rights of the other judgment creditors. They must not suffer because of the supposed fraud of Quick. They had no knowledge that the judgment was paid. Joel Huntoon & Son had. No satisfaction of Quick's judgment had ever been entered of record to give them notice, yet Joel Huntoon & Son had knowledge of such payment. No notice of the payment had ever been given by the Huntoons or by anyone else to the judgment creditors; and there was no written evidence in existence tending to show that Quick's judgment had ever been paid; and even Quick himself did not believe that it had been paid. Why did not the Huntoons protect themselves and the judgment creditors against Quick's judgment, if he committed a fraud? The Huntoons could have appeared in court at the time of the confirmation

and prevented the payment of any of the proceeds of the sale in satisfaction of Quick's judgment; but they did not do so. Under the circumstances, the judgment creditors, other than Quick, cannot be required to suffer because of Quick's supposed fraud. This fraud, or supposed fraud, cannot of itself and alone render the sale void. The sale was made upon other judgments as well as upon Quick's judgment; and the only effect that this supposed fraud, taken alone, could have upon the sale would be to deprive Quick of any of the proceeds of the sale, and to give all the proceeds to the other judgment creditors.

VIII. It is also claimed that the Mastin Bank judgment was dormant at the time of the sale, but this is not true; and upon this point the findings of the court below are against the plaintiff below, defendant in error. It is true that no execution had been issued on the Mastin Bank judgment for more than five years prior to the date of the execution upon which the property in this case was sold; but the Mastin Bank was a party to the action brought by the Capital Bank against the Huntoons and their judgment creditors within less than five years after the Mastin Bank judgment was rendered, and therefore such judgment was not dormant at the time of the sale. (*Kothman v. Skaggs*, 29 Kas. 5, 17, 18.)

IX. It is further claimed that the Topeka Bank was not a party to the Capital Bank suit until after the judgment of February 12, 1876, subjecting the lots to the payment of the judgment creditors' claims, had been rendered. This claim will not necessarily defeat or avoid the sheriff's sale, but at most can only have the effect of preventing the Topeka Bank from participating in the distribution of the proceeds of the sheriff's sale. We do not think that it can even have this effect. From anything appearing in the case, the right of the Topeka Bank to participate in such proceeds was equal to the rights of the most favored of the other judgment creditors, and the decision of the court below was that it had the right to so participate; and none of the judgment creditors are complaining. It can make no difference to the Huntoons whether

the Topeka Bank participates in the proceeds of this sale, or not, for they are all liable to pay the Topeka Bank judgment as well as the other judgments.

X. Having considered separately all the points made by the defendant in error, plaintiff below, we shall now proceed to consider them collectively; for collectively they make a much stronger case in his favor than they do when considered separately. The lots were in fact sold for a grossly inadequate price — only about one-fourth of their actual cash value; and eight of them were sold, in violation of law, at less than two-thirds of their appraised value; and the appraisement itself had been made more than four years prior to the sale, and at a time when the price of the property was very low. All were sold to one individual, Arthur Quick, who was the agent of all the judgment creditors; and but few bids were made except such as were made by him; and probably the arrangement among the judgment creditors that he should bid for them had a tendency to prevent their bidding for themselves; and the sale was made in part to pay a judgment which had previously been paid. Now probably, while not one of these things would in and of itself be considered as sufficient to render the sale as to all the lots void, or require that the sale should be set aside in this action as to all the lots, yet, taking all these things together, we are inclined to think that they are sufficient to authorize the setting aside of the sale as to all the lots which still remain in the hands of the judgment creditors and have not been sold or transferred by them to innocent purchasers. None of the aforesaid eight lots have passed out of the hands of the judgment creditors. All that any one of the judgment creditors is really entitled to receive or have is the amount of his or its judgment, with interest. Anything more is injustice. And if the sale in the present case is to be sustained and upheld, the judgment creditors will get very much more than their judgments and interest. On the other hand, the judgment debtors are entitled to a fair and reasonable compensation for their lots. This they have not obtained by the sale. As they pay interest on the judgments

against them, they should be entitled to the rise in the market value of their lots. This they have not obtained. Therefore, while gross inadequacy of price will seldom if ever alone authorize the setting aside of a sheriff's sale, yet, taking into consideration all the circumstances of this case, the gross inadequacy of price, the illegality of the sale of eight of the lots, the fact that the sale was made at such a remote period of time from the time when the appraisement was made, the fact that by reason of the agreement of the judgment creditors there was substantially only one bidder at the sale, and the further fact that the lots were bid in in part to pay a judgment which had already been paid, we think there are sufficient reasons for setting aside the sheriff's sale to the extent which we have heretofore suggested.

XI. If it be asked, why should not the sale be wholly set aside? it may be answered that it is certainly very doubtful, under the circumstances of this case and in this proceeding, whether the sale should be set aside at all or to any extent, except as to the eight lots which were sold for less than two-thirds of their appraised value. Huntoon, the defendant in error, plaintiff below, had full knowledge of the sale, yet he did not resist the sale or its confirmation, or the execution of the sheriff's deed. He made no motion to set aside the sale, nor did he ever question the regularity or the validity of the sale, or the confirmation thereof, or the sheriff's deed, either in the district court or in the supreme court, or indeed in any court, until he commenced this action in the district court more than a year after the sale and a long time after the confirmation and the execution of the sheriff's deed and the execution of the deeds from Quick to the judgment creditors. Huntoon has been guilty of *laches*, and yet he now appeals to a court of equity to obtain what he might have obtained *in the ordinary course of law* if he had exercised proper diligence. We think too many complications have arisen by reason of his *laches* and negligence, to grant him all that he now asks. (See the authorities heretofore cited, and especially *Prather v. Hill*, 36 Ill. 402; *Noyes v. True*, 23 id. 503; *Van-*

*duyne v. Vanduyne,* 16 N. J. Eq. 93; *Daniel v. Modawell,* 22 Ala. 365.)    Indeed, the court below did not set aside the sale at all; nor did it intend to set aside the sale any further than we have suggested that it should be set aside.    The court below, however, required that as to the lots sold to innocent purchasers a credit should be entered upon the judgments equal to the full value of the lots as of November 1, 1881.    Why that date should have been selected, we do not know, as the sale was made on October 18, 1880, the confirmation was had on December 18, 1880, the sheriff's deed was executed on March 1, 1881, and this action was commenced on November 22, 1881.    Also, as the law permits the property to be sold on execution for two-thirds of its appraised value, why should the judgment creditors be charged with the full value of the lots?    But still we do not think that we need to consider these questions; for, as Huntoon unreasonably neglected to resort to any of the ordinary remedies open to him, and unnecessarily waited until all these and other complications had arisen, we do not think he is now and in this action entitled to any relief with respect to the lots sold to innocent purchasers.    It is seldom that equity will assist a person who has been guilty of *laches,* or who has neglected to resort to the ordinary remedies open to him.

XII.  And in setting aside the sale as to the lots remaining in the hands of the judgment creditors, justice and equity should be done to them.    A party who seeks equity should be willing to concede equity to others.    It does not appear that the judgment creditors have made any improvements on any of the lots purchased by them, but it does appear that they have paid taxes thereon; and these taxes should be provided for.    The order setting aside the sheriff's sale, if such an order be made, should be upon the condition that all taxes which have been paid by the judgment creditors on the lots which are still in their hands shall be refunded to them before their judgments shall be considered as satisfied.    If the judgments are not paid without sale, and the lots are again sold, then, after paying the costs, these taxes should be first

paid out of the proceeds of the sale. What we have said with regard to taxes has reference to the tax-sale certificates and tax titles held by J. R. Mulvane, which were paid by the judgment creditors, and also the taxes which they have subsequently paid. The statutes require that whenever real estate is sold at judicial sale the court shall order all taxes thereon to be paid out of the proceeds of such sale. (Comp. Laws of 1879, ch. 107, art. 9, § 56; *Brown v. Evans,* 15 Kas. 88; *Opdyke v. Crawford,* 19 id. 604, 608.) And certainly equity and justice require that the taxes in the present case should be paid by the judgment debtors, or be paid out of the proceeds of the sale of the lots, if such sale is made.

XIII. We suppose a part of a record will generally prove what it purports to prove, but as was said in the case of *Haynes v. Cowen,* 15 Kas. 637, 641, 642:

"It cannot prove more than it purports to prove. No liberal presumptions can be entertained or resorted to for the purpose of supplying omissions, aiding deficiencies or extending the import of its language. It is only when the whole of the record is introduced in evidence that liberal presumptions can be invoked to aid the record."

We think no material error was committed in permitting portions of the record of the case of the Capital Bank against the Huntoons and the judgment creditors to be introduced in evidence. But evidently these portions of the record failed to prove much that the record would have proved if the entire record had been introduced in evidence. For this reason the nineteenth finding of the court below is hardly sustained by sufficient evidence, though really no point has been made in this court upon that finding.

This case will be remanded to the court below, with the order that the judgment rendered therein be modified, and for further proceedings in accordance with the views expressed in this opinion.

All the Justices concurring.